**McCARTY FARMS, INC., et al., Petitioners,**

v.

**SURFACE TRANSPORTATION BOARD and United States of America, Respondents.**

**Burlington Northern and Santa Fe Railway Company, Intervenor.**

Nos. 97–1632, 98–1304.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 3, 1998.

Decided Oct. 20, 1998.

Tim L. O'Neill argued the cause for petitioners, with whom Timothy R. Engler was on the briefs.

Thomas J. Stilling, Attorney, Surface Transportation Board, argued the cause for respondents, with whom Joel I. Klein, Assistant Attorney General, United States Department of Justice, Robert B. Nicholson, and John P. Fonte, Attorneys, Henri F. Rush, General Counsel, Surface Transportation Board, and Ellen D. Hanson, Deputy General Counsel, were on the brief.

Samuel M. Sipe, Jr. argued the cause for intervenor Burlington Northern and Santa Fe Railway Company, with whom Carolyn Doozan Clayton, Richard E. Weicher and Michael E. Roper were on the brief.

Before: SENTELLE, HENDERSON, and GARLAND, Circuit Judges.

SENTELLE, Circuit Judge:

Petitioners McCarty Farms, Inc., et al. (collectively "McCarty Farms") and the State of Montana Department of Commerce, et al. (collectively "State of Montana") challenge a decision of the Surface Transportation Board ("STB" or "Board") in which the STB ruled that petitioners had failed to demonstrate that the rates charged by Burlington Northern Railroad ("BN") to transport wheat and barley from Montana to the Pacific North-

west were unreasonable. The STB's decision covered three sets of claims: (1) single-car wheat shipments moving before September 12, 1980 (Docket No. 37809), (2) multiple-car and trainload shipments of wheat and barley (Docket No. 37815S), and (3) single-car shipments of barley and single-car wheat shipments moving after September 12, 1980 (Docket No. 37809 (Sub–No. 1)). We conclude that we have jurisdiction over the second and third categories of claims, but not the first. We further conclude that, in rendering its decision, the Board did nothing that was arbitrary, capricious, or contrary to law. As a result, we affirm the Board's ruling with respect to those claims over which we have jurisdiction.

## I. BACKGROUND

This case has a long and complex history. Indeed, these proceedings have been winding their way through the courts in one form or another for approximately 18 years. As Judge Williams noted five years ago when this case was last before this court: "McCarty Farms started this dispute's crawl through the legal system in 1980 by filing a class action on behalf of Montana farmers under 49 U.S.C. § 11705(c)(1) and 28 U.S.C. § 1337 in the U.S. district court for the District of Montana." *Burlington Northern R.R. v. ICC*, 985 F.2d 589, 592 (D.C.Cir.1993). In their Montana suit, McCarty Farms and the other class representatives alleged that BN was charging unreasonable rates for transporting single cars of wheat for the two-year period ending September 12, 1980, in violation of 49 U.S.C. § 10701(a) of the Interstate Commerce Act. *See McCarty Farms, Inc. v. Burlington Northern, Inc.*, 787 F.Supp. 937 (D.Mont.1992).

Under the doctrine of primary jurisdiction, the district court referred the action to the Interstate Commerce Commission ("ICC" or "Commission") to determine the rate reasonableness issues. On March 27, 1981, McCarty Farms filed the referred complaint with the ICC (Docket No. 37809), in which it challenged not only BN's single-car wheat rates, but also its single-car rates for barley. McCarty Farms sought a prescription on future rates and did not limit its request for

reparations to the two-year period specified in its complaint filed with the district court. McCarty Farms' Petition for Declaratory Order and Complaint at 6 (March 27, 1981). In an unpublished decision served on December 14, 1981, an Administrative Law Judge found that (1) BN had market dominance over wheat and barley traffic, (2) BN's present and past rates were unreasonable insofar as they exceeded 200% of the variable cost of service, and (3) a revenue-to-variable cost ratio of 200% was to be the maximum reasonable rate for the transportation of wheat and barley.

McCarty Farms was not alone, however, in challenging the reasonableness of BN's rates. In a separate proceeding filed with the ICC (Docket No. 37815S), the State of Montana challenged BN's rates for multiple-car and trainload shipments of wheat and barley and sought prescription for reasonable rates for the future. In an unpublished decision served on July 30, 1982, the ICC reopened the case filed by McCarty Farms (Docket No. 37809). The ICC instituted a separate proceeding regarding the reasonableness of barley rates (Docket No. 37809 (Sub–No. 1)) because it did not believe they were part of the district court's referral. The ICC consolidated the proceedings filed by McCarty Farms and those filed by the State of Montana.

The three consolidated cases before the ICC were held in abeyance indefinitely. In May 1984, McCarty Farms and the other class representatives filed a complaint in the district court, seeking a writ of mandamus. In response, the ICC reopened the proceedings on September 11, 1984. In a decision served on December 28, 1984, the ICC ruled that, to the extent market dominance issues had not been developed, additional evidence concerning market dominance would be accepted. After extensive discovery, on May 22, 1987, the ICC ruled that BN was market dominant over the subject wheat and barley shipments moving from Montana to the Pacific Northwest. *McCarty Farms v. Burlington Northern, Inc.*, 3 I.C.C.2d 822 (1987).

Having determined that BN was market dominant for the movements at issue, the ICC turned to the rate reasonableness analy-

sis. On February 5, 1988, the ICC decided that the Revenue-to-Variable Cost ("R/VC") standard was an appropriate means for testing the challenged rates and found that the rates charged by BN were unreasonable. The ICC directed BN to (1) compute the reparations due, (2) modify its existing rate structure, and (3) present a proposal of compliance to the ICC. On February 21, 1989, the ICC issued an unpublished decision that corrected several costing problems in the R/VC test and recomputed the ratios by which reparations were to be calculated. The ICC directed BN to submit a quantification of reparations due the class based on the corrected procedure and a proposal for modifying its existing rate structure so that BN would comply with the maximum reasonableness standard in the future.

On March 20, 1991, the ICC affirmed its earlier decisions in which it concluded that BN was market dominant over the movement of wheat and barley and that BN's rates for this traffic were unreasonable. The ICC calculated the amount of reparations owed by BN through 1986 to be $9,685,918 plus interest, and imposed on BN a future rate prescription procedure. *McCarty Farms v. Burlington Northern, Inc.*, 7 I.C.C.2d 1026 (1991). On July 5, 1991, BN filed a petition for clarification of the March 20, 1991 decision, asking the ICC to modify the calculations. In an unpublished decision served on November 26, 1991, the ICC entered an order which affirmed the amount of reparations and interest due through July 1, 1991. However, the ICC *sua sponte* vacated the rate prescription order contained in its March 20, 1991 decision.

McCarty Farms, the State of Montana, and BN then sought review of the ICC decisions by this court. In an opinion issued in 1993, we questioned the theoretical basis of the R/VC test and remanded the proceedings to the ICC for the purpose of reconsidering whether it was appropriate to use the R/VC test instead of the Constrained Market Pricing ("CMP") test to evaluate the reasonableness of the challenged rates. *Burlington Northern R.R. v. ICC*, 985 F.2d 589 (D.C.Cir. 1993).

In an unpublished opinion served on March 26, 1993, the ICC directed the class representatives and the State of Montana to advise the Commission whether (1) they wanted to proceed using the CMP test, (2) the proceedings should be held in abeyance pending the development of a suitable reasonableness methodology, or (3) there was some other course of action that was appropriate. On April 23, 1993, McCarty Farms notified the ICC of its election to proceed using the CMP test. On May 10, 1993, BN notified the ICC of its agreement to use the CMP test in the proceedings. Effective January 1, 1996, the ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803, abolished the ICC and transferred certain functions, including the disposition of these proceedings, to the STB. After the transfer, the STB ruled that McCarty Farms had failed to show (under the CMP test) that the challenged rates were unreasonably high, and discontinued the proceedings. *McCarty Farms, Inc. v. Burlington Northern, Inc.*, Nos. 37815S, 37809 & 37809 (Sub–No. 1) (Aug. 20, 1997) (the "1997 Decision").

Instead of petitioning the STB to correct alleged computational errors and to reconsider issues they contended were incorrectly decided, McCarty Farms and the State of Montana filed their petition for review with this court on October 14, 1997. McCarty Farms also filed an appeal with the U.S. District Court for the District of Montana, which was stayed pending the outcome of this appeal. After examining McCarty Farms' brief to this court, the STB agreed that there were certain errors in its 1997 Decision and issued a supplemental decision to correct those determinations it agreed were erroneous. *McCarty Farms, Inc. v. Burlington Northern, Inc.*, Nos. 37815S, 37809 & 37809 (Sub–No. 1) (May 11, 1998) (the "1998 Decision"). However, even after it made these corrections, the STB still concluded that BN's rates were reasonable.

## II. DISCUSSION

### A. Jurisdiction

McCarty Farms challenges this court's jurisdiction to review several claims raised in this suit. The claims at issue relate to the

following three categories of rates covered by the STB's decision: (1) single-car wheat shipments moving before September 12, 1980 (Docket No. 37809), (2) multiple-car and trainload shipments of wheat and barley (Docket No. 37815S), and (3) single-car shipments of barley and single-car shipments of wheat moving after September 12, 1980 (Docket No. 37809 (Sub–No. 1)). We conclude that we have jurisdiction over the second and third categories of claims, but not the first.

### 1. Single-car shipments of wheat for the two-year period ending September 12, 1980

■ Normally, this court has jurisdiction to review decisions of the STB under the Hobbs Act, 28 U.S.C. §§ 2321(a) and 2342(5). However, Congress has provided an exception to our Hobbs Act jurisdiction. Under 28 U.S.C. § 1336(b), review of orders of the STB that "arise" out of a referral from a district court are within that court's exclusive jurisdiction. Specifically, Section 1336(b) provides as follows:

> When a district court ... refers a question or issue to the Surface Transportation Board for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Surface Transportation Board arising out of such referral.

28 U.S.C. § 1336(b).

McCarty Farms asserts that claims relating to single-car shipments of wheat moving before September 12, 1980 (Docket No. 37809) fall within the exception to this court's jurisdiction found in Section 1336(b). These claims initially were raised in McCarty Farms' complaint filed with the U.S. District Court for the District of Montana and were referred by that court to the ICC. We agree that we do not have jurisdiction over this first category of claims. Indeed, we addressed this question the last time this case was before us. In *Burlington Northern*, we concluded that "any appeal as to the single-car wheat shipments moving before September 12, 1980 lies in the district court for the

District of Montana." 985 F.2d at 592. Therefore, it is clear that we have no jurisdiction over the first set of claims.

### 2. Multiple-car and trainload shipments of wheat and barley

We have previously ruled, and the parties agree, that we have jurisdiction over claims relating to rates charged for multiple-car shipments of wheat and barley (Docket No. 37815S) pursuant to the Hobbs Act, 28 U.S.C. §§ 2321(a) and 2342(5). In *Burlington Northern*, we concluded that Section 1336(b) "has no application" to this second category of claims because they "arise out of the Montana Department of Agriculture complaint, *not* the district court referral." 985 F.2d at 592.

### 3. Single-car shipments of barley and single-car shipments of wheat moving after September 12, 1980

■ The determination of our jurisdiction over the third set of claims is more difficult. Characterizing this jurisdictional question as "exceptionally difficult," we declined to decide this issue in *Burlington Northern* on the grounds that it was not necessary to resolve all jurisdictional questions where "the merits of a case are clearly against a party seeking to invoke the court's jurisdiction." *Id.* at 593. However, in light of the Supreme Court's intervening decision in *Steel Co. v. Citizens for a Better Environment*, —— U.S. ——, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), this position is no longer tenable. As Justice Scalia noted in that case, proceeding to the merits despite jurisdictional objections "carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers." *Id.* at ——, 118 S.Ct. at 1012. Therefore, we must resolve all jurisdictional questions before proceeding to the merits.

McCarty Farms challenges this court's jurisdiction over the third category of claims on the ground that these claims fall within the statutory exception to our jurisdiction found in 28 U.S.C. § 1336(b). McCarty Farms argues that these claims "arose" out of the referral from the Montana district court and that the district court therefore has exclusive

jurisdiction to review the STB's decision regarding these claims on appeal. In order to determine whether we have jurisdiction over the third category of claims, we must start with the text of Section 1336(b). The question of which court has jurisdiction turns on the construction of the term "arising" in Section 1336(b). In general usage, the meaning of the term "arise" is "to originate." *Black's Law Dictionary* 99 (5th ed.1979). Consistent with this usage, the third category of claims cannot be said to have "arisen" out of the district court's referral.

In no sense did the third category of claims originate in the district court's referral. The referral did not mention rates for shipments of barley or rates for shipments of wheat moving after September 12, 1980. The complaint filed with the district court did not even reference these rates. *See McCarty Farms*, 787 F.Supp. at 942 & n. 10 (reproducing relevant sections of the amended complaint). Indeed, McCarty Farms has petitioned the district court to "clarify" its referral order so that it specifically references these claims, but the district court has refused to do so. *Id.* at 947. We find McCarty Farms' argument that the claims may "arise" out of a referral that makes no mention of them unpersuasive. McCarty Farms has supplied no workable definition of the term "arise" supporting its contentions.

We acknowledge that other courts have noted that the legislative history of Section 1336(b) evidences an intent on the part of Congress to avoid "piecemeal appeals" by directing the district court to review all claims "arising" from its referral. *See Railway Labor Executives' Ass'n v. ICC*, 894 F.2d 915, 917 (7th Cir.1990) ("The insight behind section 1336(b) is that if a question within the purview of the ICC arises in the course of a district court proceeding, submission of the ICC's answer in the first instance to the district court rather than to the court of appeals will avoid a cumbersome and potentially protracted bifurcation of judicial review." (citing S.Rep. No. 1394, 88th Cong., 2d Sess. (1964))). Some courts have pointed to this legislative history in justifying a broad construction of the term "arising" in order to further this congressional goal. *See, e.g.,*

*Union Pacific R.R. v. Ametek, Inc.,* 104 F.3d 558, 561 (3rd Cir.1997) (noting that a narrow construction of the term "arising" would lead to "problems arising out of parallel proceedings in different courts arising out of a single controversy").

Nevertheless, we hold that we have jurisdiction over the third category of claims on the present facts. McCarty Farms could not have filed the third category of claims in the district court, even if it had wanted to do so. In the complaint it filed with the ICC, McCarty Farms sought a prescription on future rates, a remedy not available in the district court. *See* 49 U.S.C. § 11705(b)(1) (1988). The fact that these claims as outlined in the administrative complaint could not have been brought in the district court demonstrates that they could not have "arisen" from the district court's referral. Congress did not intend to authorize litigants to expand the district court's jurisdiction beyond its legitimate scope by filing complaints with the ICC and then seeking review of those complaints by the district court pursuant to Section 1336(b).

Moreover, the third category of claims could not have been brought in the district court because, by the time McCarty Farms filed its complaint with the ICC, the district court had been divested of jurisdiction to hear those claims. On October 1, 1980, approximately six months before McCarty Farms filed its complaint with the ICC on March 27, 1981, Congress enacted the Staggers Rail Act. The Staggers Act provides in relevant part that "[t]he jurisdiction of the Board over ... transportation by rail carriers ... is exclusive." 49 U.S.C. § 10501(b). After the parties petitioned the district court to "clarify" its referral order, that court rightly held that the Staggers Act had divested it of jurisdiction over the third category of claims. As a result, the court concluded that it could not allow McCarty Farms to amend its complaint to include the third category of claims, and it could not itself alter its referral order to specifically reference those claims. The court reasoned as follows:

[The Staggers Act] did, contrary to the assertion of the plaintiffs, divest this court of jurisdiction over challenges to the rea-

sonableness of rail rates in effect on or after the effective date of the Staggers Rail Act, i.e., October 1, 1980. Because the court would not have had jurisdiction to entertain the challenges advanced by the plaintiffs to rail rates in effect as of October 1, 1980, the court cannot acquire jurisdiction by retroactive amendment of the order of referral.

*McCarty Farms,* 787 F.Supp. at 947. These claims, not being within the jurisdiction of the district court, could not have "arisen" out of any referral from that court.

Despite any lack of clarity in either the text of Section 1336(b) or its legislative history, we are satisfied that our construction is consistent with congressional intent. Although members of Congress may have expressed an intent to further judicial economy, that laudable goal will not compel a construction whereby claims that are only tangentially related to those referred by the district court arise out of that referral along with those specifically referenced by the district court. Further, there is little danger of "piecemeal appeals" where the disputed claims are not raised with the district court, but rather are brought before the STB in the first instance. Moreover, given the specific facts in this case, there necessarily will be some duplication of judicial effort since it is undisputed that we have jurisdiction over the second category of claims, and it is clear that the district court has jurisdiction over the first category.

We have stated before that the exception to our jurisdiction under the Hobbs Act found in Section 1336(b) is a "narrow" one. *Overland Express, Inc. v. ICC,* 996 F.2d 356, 358 n. 1 (D.C.Cir.1993), *judgment vacated,* 511 U.S. 1103, 114 S.Ct. 2095, 128 L.Ed.2d 658 (1994) (noting that "§ 1336(b) is a narrow exception to our jurisdiction over challenges to Commission proceedings under the Hobbs Act"). Construing the statute narrowly gives the parties a bright line rule they may follow in seeking review of an STB decision. *See Ametek,* 104 F.3d at 566 (Roth, J., dissenting) ("The application of such a strict interpretation of § 1336(b) would reduce the chance that appeals are made to the wrong court. Counsel need only look to the language of the

district court's referral to determine whether the issue was properly reviewable by a district court...."). Under a strict construction of Section 1336(b), issues expressly set out in the district court's referral order are reviewed by the district court. The court of appeals reviews all other issues.

We note that the district court has come to the same conclusion, ruling that "the scope of the court's jurisdiction to review the Interstate Commerce Commission's decisions is determined by the scope of the referral order itself." *McCarty Farms,* 787 F.Supp. at 942. After reviewing its own referral to the ICC, that court concluded that the third category of claims at issue here did not "arise" from its referral. *Id.* at 943 ("Contrary to the assertion of the plaintiffs, the express language of the court's order of referral cannot be read to have encompassed single-car, multiple-car, and trainload rates assessed by the Burlington Northern on shipments of wheat which occurred from September 12, 1980, forward and for the future, nor on single-car, multiple-car, and trainload rates on barley from March 26, 1981, the date plaintiffs filed their administrative complaint, forward, and for the future.").

In sum, we are convinced that the disputed claims, not having been within the jurisdiction of the district court, cannot have arisen out of a referral from that court. We further hold that this conclusion is consistent with the intent of Congress as expressed in Section 1336(b).

## B. The STB's Decision

■ Having established that we have jurisdiction over the second and third categories of claims, we now turn to the merits. We review final decisions of the STB under the deferential arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Under that standard, we must uphold a decision of the STB unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* In reviewing the STB's determination of rate reasonableness issues, we must also decide whether the STB's decision is supported by "substantial evidence." 5 U.S.C. § 706(2)(E). We must "leave the

Board's judgment undisturbed" if its findings rest on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and it has articulated a "rational connection between the facts found and the [decision] made." *Burlington Northern R. Co. v. STB,* 114 F.3d 206, 210 (D.C.Cir.1997) (internal citations omitted).

■ In its petition for review, McCarty Farms contends that the STB made a number of technical errors in implementing the CMP test's stand-alone cost constraint. Under the stand-alone cost constraint, the reasonableness of a railroad's rates are judged against simulated competitive prices so that the efficiencies of a contestable market serve as the guide for establishing maximum rates. The stand-alone cost is the hypothetical cost of an efficient producer to independently provide service to a shipper or group of shippers. Thus, in implementing the CMP test's stand-alone cost constraint, the STB considers a hypothetical railroad in order to determine the maximum rates that may be charged in providing service to a shipper or group of shippers. McCarty Farms asserts that the STB erred in determining several cost components of the investment necessary to construct the hypothetical stand-alone railroad. Specifically, McCarty Farms alleges that the STB erred in (1) calculating a variety of investment costs, (2) calculating revenues, (3) rejecting McCarty Farms' proposed operating plan, (4) calculating the lease rates for locomotive and rail cars, and (5) calculating depreciation expense.

■ Upon review of the STB's decision, we cannot conclude that any of these alleged errors constitute the sort of "arbitrary" and "capricious" decisionmaking that would warrant reversal. *See Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.1976). Rather, we conclude that the STB has rationally set forth the grounds on which it acted, and its findings are based on substantial evidence. *See Burlington Northern,* 114 F.3d at 210–11. Moreover, the STB has taken steps to correct those technical errors in its 1997 Deci-

sion which it acknowledged by issuing its supplemental 1998 Decision.[1] Where an agency has rationally set forth the grounds on which it acted, as the STB has in this case, this court may not substitute its own judgment for that of the agency. *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

### III. Conclusion

For the foregoing reasons, we conclude that we have jurisdiction over claims relating to (1) multiple-car and trainload shipments of wheat and barley (Docket No. 37815S) and (2) single-car shipments of barley and single-car wheat shipments moving after September 12, 1980 (Docket No. 37809 (Sub–No. 1)). With respect to those claims over which we have jurisdiction, we conclude that the STB's decision was based on substantial evidence and was not arbitrary, capricious, or contrary to law. We therefore affirm the decision of the Board.

---

1. McCarty Farms has moved to strike any reference in these proceedings to the STB's 1998 Decision on the grounds that it was issued after McCarty Farms had filed its appeal with this

court. Because we find the decision helpful to the court and not prejudicial to the parties, we deny the motion.