# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 9, 2023　　　　　　Decided June 30, 2023

No. 22-1209

NORFOLK SOUTHERN RAILWAY COMPANY,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND UNITED STATES OF
AMERICA,
RESPONDENTS

CSX TRANSPORTATION, INC.,
INTERVENOR

———

On Petition for Review of a Decision
of the Surface Transportation Board

———

*Shay Dvoretzky* argued the cause for petitioner. With him on the briefs were *William A. Mullins*, *Crystal M. Zorbaugh*, *Parker Rider-Longmaid*, and *Hanaa Khan*.

*Laura M. Wilson*, Attorney, Surface Transportation Board, argued the cause for respondent. With her on the brief were *Robert B. Nicholson*, Attorney, U.S. Department of Justice, *Robert J. Wiggers*, Attorney, *Craig M. Keats*, General Counsel, Surface Transportation Board, and *Anika Sanders Cooper*,

Deputy General Counsel. *Theodore L. Hunt*, Associate General Counsel, entered an appearance.

*Benjamin L. Hatch* argued the cause for intervenor CSX Transportation, Inc. in support of respondent.

Before: HENDERSON, WILKINS and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Norfolk Southern Railway Company (Norfolk Southern) petitions for review of a decision of the Surface Transportation Board (STB or Board), the successor agency to the Interstate Commerce Commission (ICC) charged with authorizing certain rail carrier transactions under the Interstate Commerce Act, 49 U.S.C. §§ 10101 *et seq.* Norfolk Southern is a rail carrier that owns a 57.14 per cent share of the Norfolk & Portsmouth Belt Line Railroad Company (Belt Line), the operator of a major switching terminal in Norfolk, Virginia, known as the Norfolk International Terminal. Norfolk Southern's majority interest goes back to 1982, when its corporate family acquired and consolidated various rail carriers with smaller ownership interests in the Belt Line. Norfolk Southern's competitor, CSX Transportation, Inc. (CSX), owns the remainder of the Belt Line's shares (42.86 per cent).

Alleging Norfolk Southern and the Belt Line conspired to impede CSX's access to the switching terminal, CSX sued both entities in the Eastern District of Virginia (Eastern District court). It pressed federal antitrust, state-law conspiracy and contractual claims. Norfolk Southern asserted immunity under 49 U.S.C. § 11321(a), which provides that a "rail carrier . . . participating in [an ICC/Board-] approved or exempted

transaction is exempt from the antitrust laws and from all other law . . . as necessary to let that rail carrier . . . exercise control . . . acquired through the transaction."

The Eastern District court referred to the Board the question whether the ICC had granted control authority of the Belt Line to Norfolk Southern in the 1982 transaction. The Board answered no, reasoning that the parties to the transaction never sought ICC approval of control authority of the Belt Line. Norfolk Southern does not appeal that ruling to this or any court.

This case involves a different question raised before the Board for the first time, *viz.*, whether the ICC/Board approvals of Norfolk Southern's subsequent corporate-family consolidations in 1991 and 1998 authorized Norfolk Southern to control the Belt Line. The Board again answered no, for essentially the same reason: the Belt Line was not mentioned in the consolidation proceedings.

Norfolk Southern petitions for review, asserting that the Board's decision regarding the 1991 and 1998 consolidations was arbitrary and capricious. Respondent STB and Intervenor CSX challenge our jurisdiction because the agency decision arose from the Eastern District court's referral order. *See* 28 U.S.C. § 1336(b). As detailed below, we conclude that we have jurisdiction to review the challenged portions of the Board's decision, 28 U.S.C. §§ 2321(a), 2342(5), and deny Norfolk Southern's petition for review on the merits.

4

**I.**

**A.**

The Interstate Commerce Act (ICA) vests the Board—or before 1996, the ICC[1]—with "exclusive authority to examine, condition, and approve proposed mergers and consolidations of transportation carriers within its jurisdiction." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 119–20 (1991) (citing 49 U.S.C. § 11343(a)(1), now at 49 U.S.C. § 11323(a)). Pursuant to this authority, the Board must "approve and authorize" certain transactions involving rail carriers "when it finds the transaction is consistent with the public interest." 49 U.S.C. § 11324(c); *see id.* § 11323(a) (identifying transactions subject to section 11324(c)). One such transaction is the "[c]onsolidation or merger of the properties or franchises of at least 2 rail carriers into one corporation for the ownership, management, and operation of the previously separately owned properties." *Id.* § 11323(a)(1). Another is one rail carrier's "[a]cquisition of control" of another rail carrier. *Id.* § 11323(a)(3). Control "includes actual control, legal control, and the power to exercise control" by various means, including stock ownership. *Id.* § 10102(3). In determining whether a transaction is consistent with the public interest, the Board must consider, *inter alia*, the anticompetitive effects of the transaction, *id.* § 11324(b)(5), (d), and should it authorize the transaction, the Board "may impose conditions governing the transaction," *id.* § 11324(c).

---

[1] "The ICC Termination Act of 1995 (ICCTA) abolished the Interstate Commerce Commission (ICC) and established the STB in its stead." *United Transp. Union v. STB*, 114 F.3d 1242, 1243 n.1 (D.C. Cir. 1997) (citing Pub. L. No. 104–88, 109 Stat. 803). We refer to the ICC or the Board as appropriate.

Once the Board approves a transaction, "[a] rail carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that rail carrier, corporation, or person carry out the transaction, hold, maintain, and operate property, and exercise control or [sic] franchises acquired through the transaction." *Id.* § 11321(a). Section 11321's immunity provision becomes effective at the time of the Board approval. *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 298–299 (1987) (Stevens, J., concurring).

The Board may approve a transaction in one of two ways: (1) through the ordinary, formal application process or (2) by granting an exemption from the ordinary process. In the first route, the formal application process, the Board evaluates a voluminous application from "the person seeking [Board] authority" for the transaction. 49 U.S.C. § 11324(a); *see id.* § 11325 (providing general application procedure); 49 C.F.R. § 1180.4(a)–(c) (identifying general, prefiling and filing requirements for applications). The other route for Board approval is the exemption route, which "streamlines the regulatory process by eliminating notice and comment in some cases, by making a hearing unnecessary, and by expediting the final decision." *Vill. of Palestine v. ICC*, 936 F.2d 1335, 1337 (D.C. Cir. 1991). The Board's exemption authority flows from 49 U.S.C. § 10502(a).[2] That section also authorizes the Board

---

[2] The ICCTA renumbered various provisions of the Interstate Commerce Act, including § 10502, which was formerly codified under 49 U.S.C. § 10505. Section 10502 provides in relevant part:

> [T]he Board, to the maximum extent consistent with this part, shall exempt a person, class of persons, or a transaction or service whenever the Board finds that the application in whole or in part of a provision

to "revoke an exemption, to the extent it specifies," whenever it concludes that revocation is "necessary to carry out the transportation policy of section 10101." *Id.* § 10502(d).

The Board administers section 10502(a)'s exemption authority through a "[n]otice of exemption" process, 49 C.F.R. § 1180.4(g), for those transactions falling within one of nine "class exemptions," *id.* § 1180.2(d). For each of the nine class exemptions, *see id.* § 1180.2(d)(1)–(9), the Board has determined that "its prior review and approval of these transactions is not necessary to carry out the rail transportation policy of 49 U.S.C. [§] 10101; and is of limited scope or unnecessary to protect shippers from market abuse." 49 C.F.R. § 1180.2(d). Of relevance here, section 1180.2(d)(3) contains the class exemption for corporate-family transactions, providing streamlined review for "[t]ransactions within a corporate family that do not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family." *Id.* § 1180.2(d)(3).

"A notice must be filed to use one of these class exemptions" using the procedures "set out in § 1180.4(g)." 49 C.F.R. § 1180.2(d). A party must, *inter alia*, "file a verified notice of the transaction with the Board," *id.* § 1180.4(g)(1), and describe the proposed transaction for which exemption is sought, *id.* § 1180.4(g)(1) (citing 49 C.F.R. § 1180.6(a)(1)(i)–

---

of this part—(1) is not necessary to carry out the transportation policy of section 10101 of this title; and (2) either—(A) the transaction or service is of limited scope; or (B) the application in whole or in part of the provision is not needed to protect shippers from the abuse of market power.

49 U.S.C. § 10502(a).

(iii), (a)(5)–(6), (a)(7)(ii)), including "[t]he purpose sought to be accomplished by the proposed transaction," *id.* § 1180.6(a)(1)(iii). Despite the streamlined nature of the exemption proceedings, the regulation cautions that "[i]f the notice contains false or misleading information . . . , the Board shall summarily revoke the exemption for that carrier and require divestiture." *Id.* § 1180.4(g)(1)(iv).

**B.**

The Belt Line was established in 1896 as a joint venture of eight railroads to provide switching services in Norfolk, Portsmouth and Chesapeake, Virginia. Before 1980, Belt Line's stock was held by four different rail systems. In 1980, CSX acquired two of the railroads, giving it ownership of 42.86 per cent of the Belt Line's stock. This is the same percentage that CSX holds today. That same year, a noncarrier holding company, Norfolk Southern Corporation (NSC), applied for ICC authorization to acquire the other two railroads, Norfolk and Western Railway Company (NW) and Southern Railway Company (SR)—SR being Norfolk Southern's predecessor.[3] The application made no mention of the Belt Line "except in a chart attached as Appendix 2 to Volume 2 of the Application (Appendix 2) listing all the railroad companies in which NW and SR[] held an ownership interest" and in a discussion of the operating plan. *Norfolk Southern Railway Company—Petition for Declaratory Order*, Docket No. FD 36522, 2022 WL 2191932, at *3 & n.8 (S.T.B. June 17, 2022); *see also NWS*

---

[3] The holding company's name at the time of the application was NWS Enterprises, Inc. but by the time the transaction was approved the company had changed its name to Norfolk Southern Corporation (NSC). *See Norfolk Southern Railway Company—Petition for Declaratory Order*, Docket No. FD 36522, 2022 WL 2191932, at *2 & n.2 (S.T.B. June 17, 2022). NSC is Petitioner Norfolk Southern's parent company.

*Enterprises; Application to Control Norfolk and Western Railway Co. and Southern Railway Co.*, Fin. Dkt. No. 29430, 46 FED. REG. 173, 173–76 (Jan. 2, 1981). The ICC approved the acquisition in 1982. *Norfolk Southern*, 2022 WL 2191932, at *4. As a result of the 1982 transaction, CSX held 42.86 per cent of the Belt Line and NSC held the remaining 57.14 per cent.[4]

In 1991, the ICC, pursuant to the exemption for transactions "within a corporate family," *see* 49 C.F.R. § 1180.2(d)(3), granted SR authority to acquire NW as a subsidiary. The exemption, as published in the *Federal Register*, noted that as a result of the transaction, SR "will obtain direct control of NW and indirect control of [NW's subsidiaries]." *Southern Railway Co.—Control Exemption—Norfolk and Western Railway Co.*, Fin. Dkt. No. 31791, 56 FED. REG. 1541, 1541 (Jan. 15, 1991). Moreover, as part of the transaction, SR changed its name to Norfolk Southern Railway Company (Norfolk Southern). *Id.* Neither SR's notice of exemption nor the *Federal Register* made any mention of SR, Norfolk Southern or any other entity acquiring control of the Belt Line as a result of the transaction;[5] instead, the transaction was "intended to effect operating efficiencies." 56 FED. REG. at 1541. The ICC found, as required by 49 C.F.R.

---

[4] During that decade, CSX and NSC agreed to proportional representation on the Belt Line's board of directors; CSX had the right to appoint two members and NSC the right to appoint three.

[5] SR's notice stated: "The exempt transactions are (1) direct control through stock ownership of NW by SR and indirect control by SR of NW's rail carrier subsidiaries; and (2) guarantee by SR of NW's obligations in respect of certain mortgage bonds and debentures." J.A. 788–89. The "rail carrier subsidiaries" of NW were identified as Chesapeake Western Railway, the Toledo Belt Railway Company and Wabash Railroad Company. J.A. 790.

§ 1180.2(d)(3), that the transaction "will not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family." 56 FED. REG. at 1541. As a result of the 1991 transaction, Norfolk Southern assumed control of 57.14 per cent of Belt Line's stock.

In 1998, pursuant to another corporate-family transaction exemption, the Board authorized the merger of NW into its parent, Norfolk Southern (formerly SR). The *Federal Register*'s publication of the exemption stated that "[t]he transaction will simplify [Norfolk Southern]'s corporate structure and eliminate costs associated with separate accounting, tax, bookkeeping and reporting functions." *Norfolk Southern Railway Company; Merger Exemption; Norfolk and Western Railway Company.*, Fin. Dkt. No. 33648, 63 FED. REG. 46278 (Aug. 31, 1998). Again, the Board made the requisite finding under 49 C.F.R. § 1180.2(d)(3) but neither the notice of exemption nor the *Federal Register* mentioned acquisition of control of the Belt Line. Instead, the notice stated that the transaction was "designed to further the goal of corporate simplification." J.A. 809. After the 1998 transaction, the separate corporate existence of NW ceased and Norfolk Southern acquired ownership of all of NW's assets.

## C.

Fast forward 20 years: in 2018, CSX sued Norfolk Southern and the Belt Line in the Eastern District of Virginia, alleging antitrust, conspiracy and contract law violations arising from Norfolk Southern's and the Belt Line's alleged actions to deprive CSX of rail access to the Norfolk International Terminal. *See* Complaint, *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, No. 2:18-cv-530 (E.D. Va. filed Oct. 4, 2018), ECF No. 1. It alleged that Norfolk Southern and the Belt

Line conspired to use the Belt Line "as a chess piece" to establish and maintain Norfolk Southern's "monopolistic control over intermodal transportation."[6] Compl. at 3. Norfolk Southern moved to dismiss, relying on its immunity from suit pursuant to 49 U.S.C. § 11321(a). *See CSX Transp., Inc. v. Norfolk S. Ry. Co.*, No. 2:18-cv-530, 2021 WL 2908649, at *2 (E.D. Va. May 18, 2021).

On May 18, 2021, the Eastern District court issued its referral order. *See id.* at *1–11. After setting out the history of the 1982 consolidation and the parties' immunity arguments, it concluded "that the STB is the proper authority to clarify the contours of the 1982 consolidation at issue in this case." *Id.* at *9. It then granted Norfolk Southern's stay motion and referred "[t]he following discrete question" to the Board:

> Did the 1982 consolidation, whereby NSC acquired an indirect 57 percent interest in Belt Line, involve the ICC/STB granting NSC "approval" to control Belt Line, and if so, did such authorized "control" render it necessary for antitrust and/or state conspiracy laws to yield, whether because Belt Line was then deemed a "franchise" of NSC, or for any other reason?

*Id.* at *11.

On referral, the Board concluded that "the ICC did not authorize NSC to control [the Belt Line]." *Norfolk Southern*, 2022 WL 2191932, at *7. It reasoned that, in 1980, NSC had

---

[6] Intermodal transportation uses two modes of freight, including ship and rail, to transport goods. *See Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 883 F.2d 93, 101 n.9 (D.C. Cir. 1989).

11

asserted that including the names of the "non-system companies"—*i.e.*, railroad companies in which NW and SR had interests but did not control, *see id.* at *2—and submitting their information would "substantially burden the record" and "serve no useful purpose." *Id.* at *8 (quoting original 1980 petition). The unmentioned Belt Line was one of those non-system companies. *Id.*; *see also* 46 FED. REG. at 174, 176 (omitting Belt Line from list of "[t]he rail carrier subsidiaries of NW and the SR consolidated system carriers" of which NSC acquired control). "The Petition did not name the non-system companies or provide any information about them except to state that NW and SRC held a 50% or less interest in these companies, did not control them, had no intention of controlling them after the transaction, and the records for these companies were maintained separately from the NW and SR[] consolidated data." *Norfolk Southern*, 2022 WL 2191932, at *8. "The only logical reading of the Petition," the Board determined, "is that petitioners were telling the Board that the non-system companies were outside the scope of the control authority being requested." *Id.* at *9.

Having concluded that the 1982 ICC approval did not grant authority to control the Belt Line, the Board turned to Norfolk Southern's other argument, not made before the Eastern District court, that the ICC/Board's subsequent decisions in 1991 and 1998 granted Norfolk Southern this authority. *See id.* at *13. Noting that the Belt Line "was not mentioned in either of these proceedings," it held that "an exemption under 49 C.F.R. § 1180.2(d)(3) could not have been used to grant authority to any member of NSC's corporate family to control NPBL unless authority had previously been granted for some other member of that corporate family to control NPBL." *Id.* The Board rejected the Belt Line's invitation to "retain this matter and allow [Norfolk Southern] to seek authority to now control [the Belt Line]," *id.* at *14, but

also noted that it "expects the parties to take appropriate steps to address the unauthorized control issue immediately following resolution of the district court proceeding, including any appeals," *id.* at \*14 n.25.

On August 15, 2022, Norfolk Southern petitioned for review in this Court, challenging only that part of the Board's decision holding that the 1991 and 1998 transactions did not grant Norfolk Southern control authority over the Belt Line.[7] CSX intervened and both CSX and the STB moved to dismiss for lack of jurisdiction.

## II.

All parties agree that Norfolk Southern has standing to maintain this action. Nevertheless, we "ha[ve] an 'independent obligation' to review petitioner's standing before addressing the merits." *New Jersey v. EPA*, 989 F.3d 1038, 1045 (D.C. Cir. 2021) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012)). After Norfolk Southern filed its petition for review in this Court, the Eastern District court entered final judgment, Judgment in a Civil Case, *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, No. 2:18-cv-530 (E.D. Va. Apr. 19, 2023), ECF No. 644, having dismissed CSX's claims against Norfolk Southern—including all federal antitrust and state-law contractual claims—as either time-barred, pre-empted or unsupported. *See* Opinion and Order at 1–2, 15–17, 22–23, *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, No. 2:18-cv-530 (E.D. Va. Apr. 19, 2023), ECF No. 643; *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, No. 2:18-cv-530, 2023 WL 2552343, at \*11 (E.D. Va. Jan. 27, 2023); *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, No.

---

[7] Norfolk Southern also filed a "protective complaint under § 1336(b)" in the Eastern District court, asking it "to hold the case in abeyance pending" our review. Pet'r Br. at 22.

2:18-cv-530, 2023 WL 25344, at \*27, 33, 35 (E.D. Va. Jan. 3, 2023). Accordingly, we first address whether the Eastern District court's disposition of CSX's lawsuit renders Norfolk Southern's petition moot. *See Chafin v. Chafin*, 568 U.S. 165, 171–72 (2013).

We are satisfied that Norfolk Southern's petition is not moot. Its injury arises from the Board's determination that the ICC/Board never authorized Norfolk Southern to control the Belt Line. Absent authorization, Norfolk Southern cannot avail itself of an immunity defense in the CSX litigation, *see* 49 U.S.C. § 11321(a), and that litigation remains pending in the U.S. Court of Appeals for the Fourth Circuit, *see CSX Transp., Inc. v. Norfolk S. Rwy. Co.*, No. 23-1537 (4th Cir. filed May 18, 2023). Reversal of the district court's dismissal "may be uncertain or even unlikely," *see Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019), but "uncertainty does not typically render cases moot," *Chafin*, 568 U.S. at 175. That Norfolk Southern may assert an immunity defense at a later stage in the CSX litigation, coupled with the Board's conclusion that an "unauthorized control issue" exists and must be resolved "immediately" lest Norfolk Southern incur regulatory penalties, *see Norfolk Southern*, 2022 WL 2191932, at \*14 nn.24–25, satisfies any Article III concern that a live controversy regarding the 1991 and 1998 approvals exists.

## III.

Norfolk Southern contends that the Board's decision regarding the 1991 and 1998 transactions is inconsistent with the Board's regulation, *see* 49 C.F.R. § 1180.2(d)(3), and that the Board failed to reasonably explain its decision. Respondent STB and Intervenor CSX move to dismiss the petition for lack

of subject matter jurisdiction and also defend the Board's action on the merits.

**A.**

We resolve the jurisdictional challenge before turning to the merits of Norfolk Southern's APA challenge. *See McCarty Farms, Inc. v. STB*, 158 F.3d 1294, 1298 (D.C. Cir. 1998) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). The issue is whether we can exercise jurisdiction over the challenged portion of the Board's decision pursuant to the Hobbs Act. Ordinarily, the Hobbs Act confers jurisdiction to review "all . . . final orders of the Surface Transportation Board made reviewable by section 2321 of this title." 28 U.S.C. § 2342(5); *see id.* § 2321(a) (vesting "the court of appeals" with jurisdiction over "proceeding[s] to enjoin or suspend, in whole or in part, . . . [an] order of the" STB). But the Congress has excepted from this type of review questions referred by a district court to the Board. *Id.* § 1336(b); *see McCarty Farms*, 158 F.3d at 1298–99. 28 U.S.C. § 1336(b) provides:

> When a district court . . . refers a question or issue to the [STB] for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the [STB] arising out of such referral.

28 U.S.C. § 1336(b). Put simply, "review of orders of the STB that 'arise' out of a referral from a district court are within that court's exclusive jurisdiction." *McCarty Farms*, 158 F.3d at 1298.

CSX and the STB submit that the Board decision in its entirety arose out of the referral order. *See* Intervenor Br. at 1; Resp. Br. at 2. As a result, they contend, the Eastern District of Virginia retains jurisdiction over the Board's rulings regarding the 1991 and 1998 transactions. Norfolk Southern claims that only the Board's holdings regarding the 1982 transaction arose from the referral order and thus we can review the issues surrounding the later transactions. *See* Pet'r Br. at 31. The question, then, is how we determine the extent to which the Board order is encompassed in the referral.

We believe our holding in *McCarty Farms* provides the answer. 158 F.3d 1294.[8] There, we gave a "strict construction" to section 1336(b), establishing a "bright line rule" for parties "seeking review of an STB decision." *Id.* at 1300. We held that "issues expressly set out in the district court's referral order" fall under section 1336(b) but "[t]he court of appeals reviews all other issues" under sections 2321(a) and 2342(5). *Id.*

Because the Eastern District court referred only the "discrete question" whether "the 1982 consolidation" authorized control of the Belt Line, *CSX Transp.*, 2021 WL 2908649, at *11, we are free to decide the effect, if any, of the 1991 and 1998 transactions on the Belt Line control issue. CSX contends that *McCarty Farms* supports its position because whether the later transactions conferred antitrust immunity on Norfolk Southern is "inextricably intertwined" with the

---

[8] The STB maintains the approaches taken by the Third, Seventh and Eighth Circuits are superior to ours. *See* Resp. Br. at 15–18 (citing *Ry. Lab. Execs.' Ass'n v. ICC*, 894 F.2d 915, 917 (7th Cir. 1990); *United Pac. R.R. Co. v. Ametek, Inc.*, 104 F.3d 558, 559, 562 (3d Cir. 1997); *R.R. Salvage & Restoration, Inc. v. STB*, 648 F.3d 915, 917–18 (8th Cir. 2011)). But *McCarty Farms* itself noted that our reading of section 1336(b) put us in the minority of circuits that had considered the issue. *See* 158 F.3d at 1299.

referred question regarding the 1982 merger. *See* Intervenor Br. at 6. But whether control of the Belt Line was authorized in 1982 versus whether such control was authorized in 1991 or 1998 can be analyzed separately, as the Board did in its order. *See Norfolk Southern*, 2022 WL 2191932, at *13–14.

We reject CSX's and the STB's additional challenges to our jurisdiction. First, they claim that *McCarty Farms* equated "issues" with "broad claims for relief." *See* Resp. Br. at 20; Intervenor Br. at 18. But we conclude that *McCarty Farms* means what it said: "*issues*" not "expressly set out in the district court's referral order" are to be reviewed by the court of appeals. 158 F.3d at 1300 (emphasis added). CSX also argues the "bright line rule" language is dicta. *See* Intervenor Br. at 18–19. In applying a "strict construction of Section 1336(b)," however, *McCarty Farms* intended a bright line rule for parties to follow in seeking review of a Board decision. 158 F.3d at 1300. We decline CSX's invitation to undercut precedent and undermine the reliance expectations of those parties. CSX next argues that it is "implausible to suggest that the referring district court was not seeking to have the STB resolve [Norfolk Southern]'s immunity arguments in toto." Intervenor Br. at 20. Yet the rule from *McCarty Farms* examines only "the language of the district court's referral." 158 F.3d at 1300 (quoting *United Pac. R.R. Co. v. Ametek, Inc.*, 104 F.3d 558, 566 (3d Cir. 1997) (Roth, J., dissenting)), and the Eastern District court referred *only* the issue of the "1982 consolidation," *see CSX Transp.*, 2021 WL 2908649, at *11. Finally, CSX and the STB make a judicial-efficiency argument. *See* Intervenor Br. at 20–21; Resp. Br. at 15. But *McCarty Farms* weighed—and found wanting—the judicial economy objection. 158 F.3d at 1300.[9]

---

[9] "Although members of Congress may have expressed an intent to further judicial economy, that laudable goal will not compel a construction whereby claims that are only tangentially related to

In short, we conclude that we have jurisdiction pursuant to the Hobbs Act, 28 U.S.C. §§ 2321(a), 2342(5), and, accordingly, proceed to the merits of Norfolk Southern's petition.

**B.**

On the merits, Norfolk Southern mounts an APA challenge, *see* 5 U.S.C. § 706(2)(A), arguing, first, the Board's holding as to the 1991 and 1998 transactions is inconsistent with the regulatory text and structure, *see* Pet'r Br. at 49–55; and second, the Board failed to explain its reasoning, *see id.* at 59–60. We reject both arguments.

To determine whether an agency's action or interpretation comports with its regulations, a court "must apply all traditional methods of interpretation" to the regulations. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2419 (2019) (plurality opinion); *see Green v. Brennan*, 578 U.S. 547, 553 (2016). Text comes first. *See Kisor*, 139 S. Ct. at 2419. If the agency's interpretation "would contravene the plain text of its own regulations," we reject it. *See Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018).

The corporate-family exemption provides a class exemption for "[t]ransactions within a corporate family" that meet three requirements. *See* 49 C.F.R. § 1180.2(d)(3). The transaction cannot result in "adverse changes in service levels," *id.*, it cannot result in "significant operational changes," *id.*, and it cannot result in "a change in the competitive balance with

those referred by the district court arise out of that referral along with those specifically referenced by the district court. Further, there is little danger of 'piecemeal appeals' where the disputed claims are not raised with the district court, but rather are brought before the STB in the first instance." *McCarty Farms*, 158 F.3d at 1300.

18

carriers outside the corporate family," *id.* But it is (understandably) silent regarding whether previously unauthorized control can become authorized *via* the corporate-family exemption. The Board reasoned that "49 C.F.R. § 1180.2(d)(3)'s requirement that the transaction be 'within a corporate family'" demands "that the member of the corporate family whose ownership is changing as a result of the transaction was previously authorized to be controlled by a member of the corporate family." *Norfolk Southern*, 2022 WL 2191932, at *14. In other words, the carrier of which control authority is sought must be "lawfully within" or already authorized within the corporate family. *Cf.* Resp. Br. at 26. Norfolk Southern contends there is no room for such an implicit requirement, relying on the *expressio unius est exclusio alterius* interpretive tool. *See, e.g.*, *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017); *see* Pet'r Br. at 45 ("[W]hen a regulation sets out a series of precise requirements, it is unlikely that the regulation intended further requirements."). Norfolk Southern's point is fair in theory but the reading its construction would compel—that the corporate-family exemption can cure a previously unauthorized acquisition of control—would effectively override the specific Board approval procedures for control acquisitions. *See* 49 U.S.C. § 11325; 49 C.F.R. § 1180.4(a)–(c); *see also* 49 U.S.C. § 10502(a); 49 C.F.R. § 1180.4(g).

Although Norfolk Southern characterizes the Board's position as a "policy concern," *see* Pet'r Br. at 56, the Board's previous-authorization rule is compelled by the ICA's regulatory framework. As the Board noted, Norfolk Southern's alternate reading "would allow the corporate family exemption to effectively nullify other Board requirements since parties could acquire control of a carrier without informing the Board in a transaction that would normally require an application or another type of exemption under the Board's rules and then

cure that unauthorized acquisition by reorganizing the corporate family and seeking a corporate family transaction exemption." *Norfolk Southern*, 2022 WL 2191932, at *14. And as the Board reasonably emphasized, "[t]he Board and the public must be able to clearly understand the control authority sought and granted, particularly given the significance of the immunity from antitrust laws and other laws that comes with control authority." *Id.* at *9; *see also id.* at *11 (similar).

The APA challenge also includes the claim that the Board failed to explain its reasoning. *See* Pet'r Br. at 59–60. Norfolk Southern contends that "the Board made no effort to explain why its newly announced rule and the regulatory text were consistent," *id.* at 59, and, instead, rested purely on "conclusory policy rationales," *id.* at 60. Both assertions fail. The Board supported its commonsense reading of the regulation, first, with the text itself and, second, with the structure of the Board's and ICA's requirements. The Board reasonably explained that the corporate-family exemption cannot constitute an independent basis for control authority without a corporate family member "ha[ving] previously been granted" control authority of the carrier. *Norfolk Southern*, 2022 WL 2191932, at *13. As the Board concluded, 49 C.F.R. § 1180.2(d)(3)'s exemption cannot authorize—after the fact— a new control acquisition (*i.e.*, of an entity outside the corporate family) that alters the competitive landscape, contradicts the regulation's language ("within the corporate family") and undermines the regulatory framework. *See Norfolk Southern*, 2022 WL 2191932, at *14.

For the foregoing reasons, we conclude that the Board's decision regarding the 1991 and 1998 transactions is neither arbitrary nor capricious. The Board reasonably sought to avoid an absurd interpretation of 49 C.F.R. § 1180.2(d)(3)'s corporate-family exemption that would allow a carrier to gain

control of a new entity without following the Board's review requirements and then "cure that unauthorized acquisition by reorganizing the corporate family." *Norfolk Southern*, 2022 WL 2191932, at \*14. The Board reasonably rejected Norfolk Southern's claim that, by reshuffling the pieces of its corporate family, it acquired control authority of the Belt Line *sub silentio*.

Accordingly, we deny Norfolk Southern's petition for review.

*So ordered.*