184 F.3d 892 (D.C. Cir. 1999)
 Louisiana Public Service Commission, Petitioner
v.
Federal Energy Regulatory Commission, Respondent
Mississippi Public Service Commission, et al.,Intervenors
 No. 97-1661
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued December 4, 1998
Decided August 6, 1999
 
 On Petition for Review of Orders of the Federal Energy Regulatory CommissionMichael R. Fontham argued the cause for petitioner. With him on the briefs was Noel J. Darce.
 Larry D. Gasteiger, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on
 the brief were Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor.
 Earle H. O'Donnell argued the cause for intervenor Occidental Chemical Corporation. With him on the briefs was Roger St. Vincent.
 John S. Moot argued the cause for intervenor Entergy Services, Inc. With him on the brief were William S. Scherman, Gerard A. Clark and J. Wayne Anderson.
 Glen L. Ortman argued the cause for intervenors City Council of New Orleans, et al. With him on the brief were Clinton A. Vince, Mary W. Cochran, Paul R. Hightower and George M. Fleming.
 Before: Ginsburg, Henderson, and Rogers, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Ginsburg.
 Ginsburg, Circuit Judge:
 
 
 1
 The Louisiana Public Service Commission petitions for review of two orders of the Federal Energy Regulatory Commission dismissing its complaint against Entergy Services, Inc., which owns operating companies that generate and sell electricity in Louisiana and other states. The LPSC claims that Entergy may not count interruptible service when allocating capacity costs pro rata among its operating companies because interruptible service, unlike firm service, does not require Entergy to add new capacity. The Commission held that interruptible service is properly assessed responsibility for capacity costs and, in the alternative, that the LPSC was not entitled to a hearing on its complaint because it had not alleged that the overall "rough equalization" of costs among the operating companies has been upset.
 
 
 2
 We hold that it was arbitrary and capricious for the Commission to assess capacity costs for interruptible service without an explanation for departing from its own precedent.In addition, because we are unable on this record to discern what the Commission meant by "rough equalization," we remand the case for the agency to explain its reasoning on that score as well.
 
 I. Background
 
 3
 Entergy, a public utility holding company, owns five operating companies that generate and sell electricity in four states, including Louisiana. Transactions among the operating companies are governed by a system agreement they first entered into in 1951 and last amended in 1982, when it was approved by the Commission and this court after protracted litigation.* Section 3.01 of the agreement sets forth the general goal of the companies to act as a single economic unit:
 
 
 4
 The purpose of this Agreement is to provide the contractual basis for the continued planning, construction, and operation of the electric generation, transmission and other facilities of the Companies in such a manner as to achieve economies consistent with the highest practicable reliability of service.... This agreement also provides a basis for equalizing among the Companies any imbalance of costs associated with the construction, ownership and operation of such facilities as are used for the mutual benefit of all the Companies.
 
 
 5
 The system agreement allocates capacity (or demand) costs to each operating company in direct proportion to the power that it takes when total demand upon the Entergy system peaks each month. If, at the monthly system peak, a company takes more energy than it generates, then it is considered "short" and must make an equalizing payment to the "long" companies that have provided the excess capacity. This arrangement is mutually beneficial because companies that are long have a ready outlet for their surplus energy and are thereby compensated for carrying excess capacity, while companies that are short enjoy the benefit of a low cost and dependable way of meeting their energy requirements. See Mississippi Indus., 808 F.2d at 1528-31.
 
 
 6
 The LPSC filed a complaint against Entergy under § 206 of the Federal Power Act, 16 U.S.C. § 824e(a), alleging that, due to changed circumstances, the allocation of capacity costs had become unjust and unreasonable. The Commission held the allegedly changed circumstances insufficient to warrant investigation and dismissed the complaint. See Louisiana Pub. Serv. Comm'n v. Entergy Servs., Inc., 76 F.E.R.C. p 61,168 (1996), reh'g denied, 80 F.E.R.C. p 61,282 (1997).The LPSC now petitions for review of the Commission's decision and Occidental Chemical Corporation intervenes on its behalf. Entergy and a group consisting of two state agencies and the City Council of New Orleans (collectively the state agencies) intervene on behalf of the Commission.
 
 II. Analysis
 
 7
 The LPSC claims principally that the Commission should have scheduled a hearing on its complaint. In general, the Commission must hold an evidentiary hearing whenever a complainant raises a genuine issue of fact that is material to the justness and reasonableness of a rate and cannot be resolved upon the written record. The mere allegation of a disputed fact is insufficient to command a hearing, of course;the petitioner must proffer evidence in support of its factual claim. We review a Commission decision to deny an evidentiary hearing for abuse of discretion. See Cajun Elec. Power Coop. v. FERC, 28 F.3d 173, 177 (D.C. Cir. 1994).
 
 
 8
 In this case the Commission accepted all the LPSC's factual allegations as true--they are supported by an adequate proffer of evidence--and dismissed the complaint on the ground that those facts did not justify reopening the Agreement. Accordingly, we too accept the LPSC's factual allegations as true and turn directly to the question whether the manner in which the Commission addressed them was arbitrary and capricious. See Sithe/Independence Power Partners, L.P. v. FERC, 165 F.3d 944, 948 (D.C. Cir. 1999).
 
 A.Interruptible Load and Capacity Costs
 
 9
 Capacity costs "are assessed to the peak-period users because it is peak demand that determines how much a utility will invest in capacity." Union Elec. Co. v. FERC, 890 F.2d 1193, 1198 (D.C. Cir. 1989). During the off-peak periods the capacity is available at no marginal cost; it "would be there whether or not the off-peak user made demands on it." 1 Alfred E. Kahn, The Economics of Regulation 101 (1970). A utility's decision to invest in additional capacity is therefore informed by the type of demand placed upon the system at its peak. As we have previously observed:
 
 
 10
 Electric utilities often distinguish between "firm" ser-vice, under which customers can demand power or trans-mission at any time, and "interruptible" service, whichthe utility is entitled to shut off at any point when thereis not enough excess capacity beyond that required toguarantee the needs of the utility's firm customers. In-terruptible service is typically offered at a significantdiscount because the utility's ability simply to cut offservice at peak demand periods alleviates its need to planfor and finance additional capacity to offer the service.Fort Pierce Util. Auth. v. FERC, 730 F.2d 778, 785-86 (D.C. Cir. 1984).
 
 
 11
 The Commission firmly embraced this principle of cost causation in Kentucky Utilities Co., 15 F.E.R.C. p 61,002 (1981), where it persuasively set out its rationale for not considering interruptible service when allocating capacity costs. In that case KU had the right, by agreement, to interrupt service to the City of Paris. The utility argued that it should be able to charge Paris capacity costs whenever it supplied electricity to Paris at peak. The Commission flatly rejected this position, reasoning that "because of the right to interrupt, Kentucky can keep Paris from imposing any demand on Kentucky's system during peak periods and thereby control its capacity costs." Id. at 61,004; see also Delmarva Power & Light Co., 24 F.E.R.C. p 61,199, 61,462 (1983) (following Kentucky Utilities).
 
 
 12
 The Entergy system agreement does not distinguish between interruptible and firm load in allocating capacity costs to the operating companies. Doing so was unnecessary when the agreement was last amended, apparently because the system was then awash in capacity; even projected firm load did not require additional future capacity.
 
 
 13
 The LPSC alleges, however, that changed circumstances now make it unjust and unreasonable for Entergy to continue counting interruptible load when calculating an operating company's capacity charge. First, the system no longer has surplus capacity; it even purchases electricity from other sources in order to maintain its reserve requirements during the months when demand is greatest. Second, Entergy has changed its planning criteria and no longer counts interruptible load when deciding whether to add capacity. Neither point is contested, and both are supported by affidavits attached to the LPSC's complaint; the second point is further supported by the testimony of an Entergy executive given in a retail rate proceeding before the LPSC.
 
 
 14
 In its order dismissing the complaint the Commission reasoned that "the mere fact that a load may be curtailable does not mean that it should not be considered in allocating costs" if power is in fact taken at peak. Louisiana PSC, 76 F.E.R.C. at 61,955-956. Sound familiar? This is the argument the agency rejected in Kentucky Utilities. See 15 F.E.R.C. at 61,004 ("Although Kentucky has not interrupted service to Paris at every peak period, this is irrelevant to the application of the peak responsibility method"). Presumably for that reason the Commission appended a somewhat cryptic footnote to its decision, citing testimony in which an Entergy executive said that the allocation of current, as opposed to future, capacity costs presents "a different issue." Louisiana PSC, 76 F.E.R.C. at 61,956 n.9. Similarly, the state agencies argue in the present case that planning for future capacity is immaterial to how the costs of existing capacity should be allocated, and Entergy asserts that avoidance of future costs does not warrant an investigation today.
 
 
 15
 These arguments fail to recognize that the cost-causation principle the Commission adopted in Kentucky Utilities is inherently forward-looking. As the Commission itself explained in Kentucky Utilities, "[t]he theory is that the utility must build bulk power facilities, i.e., generating units and transmission lines, in large part to meet the maximum or peak anticipated demands of its customers." Kentucky Util., 15 F.E.R.C. at 61,003 (citing James C. Bonbright, Principles of Public Utility Rates 352 (1961), 1 Kahn, Economics of Regulation 89-95). This is how Professor Alfred E. Kahn explains the point:
 
 
 16
 Marginal costs look to the future, not to the past: it is only future costs for which additional production can becausally responsible; it is only future costs that can be saved if that production is not undertaken. If capital costs are to be included in price, the capital costs in question are those that will have to be covered over time in the future if service is to continue to be rendered.
 
 
 17
 1 Kahn, at 88; see Fort Pierce, 730 F.2d at 787 ("The clear import of the Commission's decision in Kentucky Utilities is that the allocation of capacity costs to transmission service must ordinarily be justified on the basis of the transmitting utility's inability to avoid service at peak demand and its need to plan future capacity based in part on the transmission service at issue").
 
 
 18
 Pursuing a different but no less fallacious line of reasoning, the Commission claims in the alternative that it need not follow Kentucky Utilities here because that case
 
 
 19
 dealt with how a utility recovers fixed costs from customers that bought at arm's-length. Since the purchaser itself was an interruptible customer, we found that it should bear none of the seller's fixed costs. Here, in stark contrast, the rate at issue allocates the costs of an integrated system among its constituent parts. While ostensibly "purchasers," the Entergy operating companies in reality comprise the seller, the Entergy system.
 
 
 20
 Louisiana PSC, 80 F.E.R.C. at 62,007. Although the Commission does not explain what it thinks follows from this distinction between arm's-length and affiliated purchasers, its position seems to be that, because the Entergy system may be viewed as a single seller at retail, the Commission need not regulate antecedent wholesale transactions among the operating companies.
 
 
 21
 If that is the point, we reject it out of hand. As we have held before, and as the Commission itself has long insisted, it alone has jurisdiction to regulate wholesale transactions among Entergy's operating companies. See Mississippi Indus., 808 F.2d at 1540. And as to matters within its jurisdiction, the Commission has the duty--not the option--to reform rates that by virtue of changed circumstances are no longer just and reasonable. See id. at 1557; 16 U.S.C. § 824e(a).Moreover, "once FERC permits a utility to charge a rate reflecting investment in a particular plant, a state commission may be obliged to reflect such an investment in the retail rate base." Mississippi Indus., 808 F.2d at 1548. Consequently, if the allocation of costs among the operating companies is unjust or unreasonable, then retail customers in one regulating jurisdiction effectively subsidize those in another.**
 
 
 22
 We therefore hold that the Commission's 180 degree turn away from Kentucky Utilities was arbitrary and capricious. For the agency to reverse its position in the face of a precedent it has not persuasively distinguished is quintessentially arbitrary and capricious. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57 (1983) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis"). If there is any reason interruptible load should be considered in the assessment of capacity costs, it has not been articulated either by the Commission or by its claque in this proceeding.
 
 B. Rough Equalization
 
 23
 In denying rehearing the Commission, perhaps hoping to insulate from legal consequence its failure to follow Kentucky Utilities, adopted an alternative rationale: that the LPSC was not entitled to a hearing because it had not alleged that the change in circumstances had upset the "rough equalization" among the operating companies achieved by the system agreement. See Louisiana PSC, 80 F.E.R.C. at 62,007. The LPSC responds that the standard in the Federal Power Act is not rough equalization but whether the cost allocation is unjust, unreasonable, or unduly discriminatory. See 16 U.S.C. § 824e(a).
 
 
 24
 In order to function as a reviewing body the court must be "advised of the considerations underlying the action under review." SEC v. Chenery Corp., 318 U.S. 80, 94 (1943).Though it is eminently reasonable for the Commission to require some showing of materiality before it investigates the allegations made in a complaint, we cannot on this record tell how rough (that is, unequal) the agency thinks the equalization must be before it grants a hearing--and the equalization in this case seems pretty rough. See Philadelphia Gas Works v. FERC, 989 F.2d 1246, 1251 (D.C. Cir. 1993) ("For FERC to utter the words 'unique facts and circumstances' and 'equity,' ... as a wand waved over an undifferentiated porridge of facts, leaves regulated parties and a reviewing court completely in the dark as to the core of FERC's reasoning and its relationship to past precedent").
 
 
 25
 The LPSC attached to its complaint an affidavit stating that Louisiana Power & Light places nearly 1,000 MW (or 1 million KW) of interruptible load upon the system at a capacity cost of $1 to $2 per KW-month, whereas other operating companies place very little interruptible load upon the system. Compl. Ex. C. Assuming, as is clearly implied, that all of this interruptible power is taken at peak, the imbalance results in $12 to $24 million per year in demand charges erroneously allocated to Louisiana ratepayers. The Commission does not rebut nor even cast doubt upon these data, other than to point to its own conclusory statement on rehearing that neither the LPSC nor Occidental claims Entergy's allocation of capacity costs upsets the rough cost equalization among the operating companies. See Louisiana PSC, 80 F.E.R.C. at 62,007.
 
 
 26
 Instead the Commission, joined by Entergy, argues that the allocation of capacity costs to interruptible load is but one component of a complex rate. In this connection the Commission observes that in Arkansas Pub. Serv. Comm'n v. Entergy Servs., Inc, 76 F.E.R.C. p 61,040 (1996), when it granted a hearing upon the allegation that "Arkansans, who make up 31 percent of the Entergy system's load, bear[ ] approximately 62 percent of the Entergy system's total nuclear plant decommissioning costs," id. at 61,197, it set down for hearing the question "whether changes in other system costs may offset increases in nuclear plant decommissioning costs."Id. at 61,198. In that case, however, the Commission did not fault the petitioner for failing to allege that no other elements of the rate could offset the facially significant charges of which it complained; rather, the agency quite reasonably set the issue of offsetting changes in costs down for hearing at the request of the respondent utility.
 
 
 27
 Entergy also cites Houlton Water Co., 55 F.E.R.C. p 61,037 (1991) (Houlton I), in which the Commission refused to grant a hearing to a petitioner that challenged only one aspect of a utility's rate without alleging that the entire rate had become unreasonable. We note that subsequently the petitioner filed another complaint supported by additional cost data indicating that the utility was overcharging its ratepayers by $567,400 annually, which showing the Commission held sufficient to warrant a hearing. See Houlton Water Co., 58 F.E.R.C. p 61,301 (1992) (Houlton II). The principal rationale of both Houlton cases seems to have been that a petitioner "must provide some basis to question the reasonableness of the overall rate level, taking into account changes in all cost components." Houlton I, 55 F.E.R.C. at 61,110;see also Houlton II, 58 F.E.R.C. at 61,963. If an alleged annual overcharge of $567,400 was sufficiently material to warrant a hearing in that case, then we are at a loss to understand why the $12 to $24 million annual difference alleged here fails to provide "some basis to question the reasonableness of the overall rate level," Houlton I, 55 F.E.R.C. at 61,110, granting, of course, that it does not preclude the possibility that there might be offsetting changes in other costs. Moreover, even if Entergy is correct that Houlton I stands for the proposition that the Commission requires a complainant to support its petition with an analysis of all components of the overall rate, we do not see how such a rule can be squared with the result the Commission later reached in Arkansas PSC. As discussed above, in that case the Commission did not require the petitioner, which had alleged a facially significant disparity arising from changed circumstances, to submit data tending to negate the possibility that there might be offsetting changes in other costs; it merely held that the hearing "also should take into account whether changes in other system costs may offset increases in [the] costs" that the Arkansas PSC had challenged. Arkansas PSC, 76 F.E.R.C. at 61,198.
 
 
 28
 For these reasons, we think the Commission's position that the LPSC has failed to allege a departure from the rough equalization of costs among the operating companies is unresponsive to the LPSC's claim that the method of allocating costs provided in the system agreement has become unjust and unreasonable. The opacity of the Commission's terse orders, however, makes it impossible for us to discern the content of its "rough equalization" standard. (We are reminded of what Lord Byron wrote of Coleridge: "like a hawk encumber'd with his hood, Explaining metaphysics to the nation--I wish he would explain his Explanation." Don Juan, canto I, dedication, stanza 2.) The Commission must explain its rough equalization standard on remand and then either reveal why the LPSC's allegation of an unjust and unreasonable method of allocation with facially significant consequences does not meet that standard, or grant the LPSC a hearing, as the case may be.
 
 C.PURPA
 
 29
 The Public Utilities Regulatory Policy Act of 1992 requires states to consider--but not to adopt--economically efficient practices such as offering consumers "an interruptible rate which reflects the cost of providing interruptible service." 16 U.S.C. § 2621(d)(5). The LPSC claims it has implemented this section of the PURPA (as well as another, which we need not discuss for the result is the same) and that the Commission's orders impermissibly conflict with the PURPA. Formulating the issue another way, the LPSC asserts that the asserted conflict with the PURPA violates principles of federalism because it amounts to a "reverse trapping" of costs at the retail level. "Trapping" at the wholesale level occurs when a state exercises its "jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate." Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 970 (1986) (holding such "trapping" prohibited by Supremacy Clause). The LPSC asserts that the Commission's refusal to implement the PURPA, combined with the LPSC's own adoption of those standards, leaves unrecoverable at the retail level costs that must be paid under the wholesale tariff, or in this instance the system agreement.
 
 
 30
 The Commission claims this second formulation is raised for the first time on review and therefore waived. We need not resolve the waiver question, however, because both versions in substance make the same argument, which lacks any merit. The Congress, perhaps mindful that the Commission could be faced with 50 separate regulatory regimes affecting any policy it might implement, specifically provided that the PURPA does "not apply to the operations of an electric utility ... to the extent that such operations ... relate to sales of electric energy for purposes of resale." 16 U.S.C. § 2612(b);see also Cities of Bethany v. FERC, 727 F.2d 1131, 1137 (D.C. Cir. 1984) ("Nothing in the [PURPA] requires FERC to adopt the views of state rate-setting commissions when the Commission evaluates the reasonableness of rates that a utility may charge to wholesale customers").
 
 
 31
 It is apparent, therefore, that the LPSC's implementation of the PURPA does not bind the Commission in this case. The Congress has expressly precluded that result.
 
 III. Conclusion
 
 32
 The Commission's unexplained failure to follow its precedent in Kentucky Utilities is arbitrary and capricious. The Commission needs to give a reasoned explanation of its seemingly obscure standard of "rough equalization," and to apply that standard to the facts alleged by the LPSC. Accordingly, the petition for review is granted, the orders of the Commission are vacated, and this matter is remanded to the Commission for further proceedings consistent herewith.
 
 
 33
 So ordered.
 
 
 
 Notes:
 
 
 *
 See Middle South Energy, Inc., 31 F.E.R.C. p 61,305, reh'g denied, 32 F.E.R.C. p 61,425 (1985), aff'd, Mississippi Indus. v. FERC, 808 F.2d 1525 (D.C. Cir.), vacated in part after recons., 822 F.2d 1104 (D.C. Cir.) (in banc), order on remand, System Energy Resources, Inc., 41 F.E.R.C. p 61,238 (1987), reh'g denied, 42 F.E.R.C. p 61,091 (1988), aff'd, City of New Orleans v. FERC, 875 F.2d 903 (D.C. Cir. 1989).
 
 
 **
 In response to a similar concern raised in Mississippi Industries, we observed that "[i]n any wholesale rate proceeding, the state commissions may protect their interests [by] presenting evidence before the Commission, a neutral body." Id. In making that observation, however, we presumed the Commission would not abdicate its exclusive jurisdiction over wholesale rates. See Southern Cal. Edison Co. v. FERC, 162 F.3d 116, 118 (D.C. Cir. 1998) (rejecting Commission's argument that, because petitioner's interest stemmed from downstream effect on retail rates, Commission lacked jurisdiction over wholesale allocation of costs in settlement).