# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 20, 2024　　　Decided January 14, 2025

No. 23-1291

AMERICAN WHITEWATER,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CONSERVATION LAW FOUNDATION, ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Haley Nicholson* argued the cause for petitioner. With her on the briefs were *Robert A. Nasdor* and *Kevin Cassidy*.

*Sean Mahoney* and *Charles Owen Verrill, Jr.* were on the brief for intervenors Conservation Law Foundation and Maine Rivers in support of petitioner.

*Angela X. Gao*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Matthew R. Christiansen*, General Counsel, and

*Robert H. Solomon*, Solicitor. *Jared Fish*, Attorney, entered an appearance.

*Julia S. Wood* and *Sharon L. White* were on the brief for intervenor Aclara Meters, LLC in support of respondent.

Before: HENDERSON and PAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: This case arises from the surrender of a license for a hydroelectric project on the Salmon Falls River between New Hampshire and Maine. From 2016 to 2023, Aclara Meters LLC (Aclara) owned the license to the Somersworth Hydroelectric Project (the Project). Aclara sought to surrender its project license to the Federal Energy Regulatory Commission (FERC or the Commission) in 2019. After conducting an environmental assessment, the Commission authorized Aclara's surrender in 2023. American Whitewater (Whitewater)—a conservation organization working to restore America's whitewater rivers—requested rehearing and argued that two dams from the Project should be removed as a condition of surrender. After FERC denied that request, Whitewater petitioned this Court for relief, arguing that the Commission acted arbitrarily and capriciously under the Federal Power Act (the FPA) and the National Environmental Policy Act (NEPA).

FERC's analysis was neither arbitrary nor capricious. It reasonably determined that dam removal was unfeasible because local municipalities relied on the reservoir for key water needs. Even if it were feasible, FERC appropriately considered dam removal as an alternative to surrender without removal and rejected it because the benefits to local municipalities of keeping the dams outweighed the benefits to

the environment and recreation from removal. The Commission also appropriately assessed the public interest and did not unreasonably depart from its situation-specific precedents. Accordingly, we deny Whitewater's petition for review.

## I.

## A.

The Project is located on the Salmon Falls River, on the border between the City of Somersworth, New Hampshire and the Town of Berwick, Maine, and includes two dams—Stone Dam and Back Dam.[1] The Project also includes a canal to divert water from Stone Dam's reservoir (or impoundment), a gatehouse to control water flow from the reservoir to the canal,

---

[1] Aclara disputes whether Back Dam is included in its project license. Intervenor for Resp't's Br. 20 n.9, 21. At oral argument, FERC and Whitewater agreed that Back Dam is not included in the project license. Oral Arg. Tr. 9:1–6 (Whitewater), 14:18–19 (FERC). When initially applying to the Commission for relicensing of the Project, Aclara referenced Back Dam as part of the project facilities, boundary, features and *license*. J.A. 64, 68, 73. "Figure 1" in the amended license identifies Back Dam as a "principal feature[]" of the Project but locates it just outside the "project boundary" and the license does not list it explicitly among the "project works," although there is a residual clause for "appurtenant works." J.A. 233, 239. The record is therefore unclear on whether Back Dam is part of the project license. Even if it is not, Aclara forfeited any argument that FERC lacks the authority to require removal of a structure that is not part of a project's license as a condition of license surrender by not raising the issue in its brief. *See, e.g.*, *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997) (a litigant does not argue an issue by raising it only in "cursory fashion").

a penstock to connect the canal to the powerhouse and a powerhouse containing turbines to generate electricity. The reservoir extends 0.8 miles upstream from Stone Dam and Back Dam is 0.3 miles downstream of Stone Dam. Water not diverted to the powerhouse is released into the river downstream of Stone Dam, known as the "bypass reach," and water is released at around the same rates as the river's natural flow to protect fish and wildlife. The Project has not generated power since a penstock failure in 2011 so that all water flows into the bypass reach.

There are fifteen functioning dams on the Salmon Falls River, and Stone and Back Dams are respectively the fifth and fourth from the mouth of the river. Three other FERC-licensed projects with dams are downstream of the Project: Lower Great Falls, Rollinsford and South Berwick. Green Mountain Power Corporation (Green Mountain) operates all three downstream projects. Relicensing of the Lower Great Falls and Rollinsford Projects in 2022 and 2023 included conditions for fish passage. Specifically, Green Mountain had to either construct permanent fishways at both projects—so fish can swim around the dams and migrate upstream—or build a "trap and truck" facility at South Berwick to transport fish for release upstream, bypassing the Rollinsford, Lower Great Falls and Somersworth Projects. Ultimately, on May 1, 2024 Green Mountain chose the trap-and-truck option and thus fishways will not be built at Rollinsford or Lower Great Falls in the foreseeable future.

Stone Dam was built in 1929 and Back Dam likely dates from around the same time. FERC licensed the Project to General Electric (GE) for 40 years in 1981 to power a manufacturing plant on site. In 2016, Aclara obtained the license after buying the plant and Project facilities from GE. Aclara initially intended to fix the penstock and restart the

Project but abandoned those plans after determining that it would be unprofitable to do so.

The FPA authorizes FERC to regulate the licensing of hydropower projects on "navigable waters of the United States." 16 U.S.C. § 817(1); *S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 373 (2006). An existing license may be "surrendered only upon mutual agreement between the licensee and the Commission." 16 U.S.C. § 799; *see also* 18 C.F.R. § 6.2. To initiate surrender, a licensee must file an application stating the reasons for surrender, 18 C.F.R. § 6.1, and FERC may impose "conditions" that the licensee must fulfill before surrender is complete, including with respect to decommissioning any project works that have been built, *id.* § 6.2.

Decommissioning can range from "simply shutting down the power operations" to "tearing out all parts of the project, including the dam, and restoring the site to its pre-project condition"; and "solutions necessarily will vary from one situation to another." *Project Decommissioning at Relicensing; Policy Statement*, 60 Fed. Reg. 339, 340 (Jan. 4, 1995) (Decommissioning Policy). If a "mutually acceptable resolution" cannot be reached among interested parties, FERC may "take steps necessary to assure that the public interest is suitably protected, including, in the rare case, requiring removal of the project dam." *Id.* Upon surrender, the Commission's jurisdiction ends; FERC therefore takes the position that it does not have "the authority to require the existing licensee to install new facilities, such as fish ladders," as a condition of surrender. *Id.* at 346. Requiring a "new facility is a step for any successor agency to take." *Id.* Similarly, although the Commission "may require licensees to provide certain recreational opportunities in association with

licensed activities, that obligation ends when the project is no longer licensed." *Id.*

Aclara filed a surrender application with FERC on March 29, 2019, which proposed to fill in the penstock with sand, remove electrical equipment and hydraulic fluid from the powerhouse and leave the dams in place. Citing comments from the City of Somersworth, Aclara highlighted that Stone Dam is critical for water supply in Somersworth and Berwick, and that the City's water treatment plant would be affected by a change in water levels if Stone Dam were removed. Aclara also referenced City comments that removing the dam could negatively affect upstream infrastructure, including the bridges that cross the reservoir. Aclara also stated that Stone Dam is required to rewater the canal, which must be maintained for the industrial purposes of providing cooling water and back-up fire protection at Aclara's adjacent manufacturing plant.

**B.**

FERC's consideration of a surrender application requires environmental review under NEPA. 42 U.S.C. § 4321 *et seq.* "Any proposed 'major Federal action[] significantly affecting the quality of the human environment' triggers in an agency the obligation to prepare an Environmental Impact Statement (EIS) discussing in detail the environmental impact of the proposed action, alternatives to the action, and other considerations." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (quoting 42 U.S.C. § 4332(C)).

NEPA mandates that an agency "consider every significant aspect of the environmental impact of a proposed action." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)). In other words, an agency is required to "take a 'hard

look' at the environmental consequences before taking a major action." *Id.* (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). "[A]n agency has taken a 'hard look' at the environmental impacts of a proposed action if 'the statement contains sufficient discussion of the relevant issues and opposing viewpoints,' and . . . the agency's decision is 'fully informed' and 'well-considered.'" *Myersville*, 783 F.3d at 1324–25 (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)). "Congress in enacting NEPA, however, did not require agencies to elevate environmental concerns over other appropriate considerations." *Balt. Gas*, 462 U.S. at 97 (citing *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227 (1980) (per curiam)).

In conducting an EIS, "agencies may reject unreasonable [or impractical] alternatives after only brief discussion." *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1182 (D.C. Cir. 2023). "An agency may preliminarily prepare an Environmental Assessment (EA) to determine whether the more rigorous EIS is required." *Myersville*, 783 F.3d at 1322 (citing 40 C.F.R. §§ 1501.4, 1508.9). If an agency finds no significant environmental impact, an EIS is unnecessary under NEPA. *Id.* Although an EIS requires an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives," an EA requires only "brief discussion[]" of reasonable alternatives. *Id.* at 1323 (citing 40 C.F.R. §§ 1502.14(a), 1508.9(b)). "An alternative is reasonable if it is 'technically and economically practical or feasible and meet[s] the purpose and need of the proposed action.'" *Biological Diversity*, 67 F.4th at 1182 (citing 43 C.F.R. § 46.420(b)). We also give "considerable deference to the agency's expertise and policy-making role" regarding both "whether [its] objectives are reasonable" and "whether a particular alternative is reasonable in light of these objectives." *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999).

FERC completed its environmental assessment on January 6, 2021.[2] It determined that approving surrender as proposed would not be a major federal action significantly affecting the quality of the human environment and so an EIS was not required. No party contests that determination. FERC also concluded that leaving the dams in place would not affect recreation, fisheries or federally protected species. The Commission found that keeping the dams would have a negligible impact on recreational opportunities because the Project is in an industrial setting and lacks formal recreation facilities. FERC further noted that the Market Street bridge, just upstream from Stone Dam, prevents boaters from accessing Stone Dam and that summer water flows are too low to support boating even when all the water is spilled over into the bypass reach. The Commission also observed that the Lower Great Falls and Rollinsford Projects blocked fish passage, although they would not do so if fish passage facilities were installed.

Finally, FERC found that there were "no feasible alternatives" to surrender without removal because (1) Stone Dam's reservoir was a source of water supply for Somersworth

---

[2] After the parties fully briefed the case *sub judice*, we held that NEPA's implementing regulations are *ultra vires* and therefore non-binding because the Council on Environmental Quality lacks rulemaking authority. *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 908–15 (D.C. Cir. 2024). As a result, FERC arguably had no obligation to issue an environmental assessment. However, the Court "must judge the propriety of [agency] action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Here, the Commission's surrender and rehearing orders relied on its environmental assessment. Therefore, we consider that assessment in determining whether FERC's actions were arbitrary or capricious.

and Berwick and used for local firefighting, (2) Stone Dam's removal could affect local infrastructure, (3) the dams were important historic features,[3] (4) the benefits of removing Back Dam without Stone Dam were limited as both are in an industrial area and close to each other and (5) the Commission could not require Aclara to install fish passage facilities as a condition of surrender.  J.A. 384–85.

## C.

FERC considered comments on the environmental assessment in its Order Approving Surrender of License (Surrender Order), issued May 22, 2023.  It found that removing the dams or adding fish passage facilities would have "significant and permanent" "beneficial effects" of "connectivity to upstream habitat[s]," "removing obstructions that limit boating opportunities" and "sustainable fishing." J.A. 440.  It also found that "[n]egative effects" "would include temporary effects on water quality," "temporary adverse effects on aquatic species due to displacement," "impacts to air quality during construction" and "an increase in noise and construction traffic." *Id.*  FERC observed that it was "unknown

---

[3]  FERC considered the potential impact on historic properties under section 106 of the National Historic Preservation Act.  *See* 54 U.S.C. § 306108.  In its opening brief, Whitewater alleges that the Commission's approval of Aclara's surrender application improperly relied on the dams' potential eligibility for listing as historic properties.  FERC disclaimed any such reliance and noted that neither its surrender nor rehearing order discussed historical impact as a reason for rejecting the dam removal alternative. Because Whitewater in its reply brief does not contest the Commission's response, we consider this issue to be abandoned.  *See Wal-Mart Stores, Inc. v. Sec'y of Labor*, 406 F.3d 731, 736 n.* (D.C. Cir. 2005).

what effect dam removal would have on the City of Somersworth's existing water supply infrastructure" but that the City "stated that . . . its water treatment plant, as well as two bridges upstream, would be negatively impacted by any changes in impoundment levels." J.A. 440–41. FERC also noted that it was unknown at that time whether the Town of Rollinsford would choose to construct a fishway at Rollinsford or trap and truck fish from South Berwick.[4]

Applying its "broad 'public interest' standard" for evaluating the voluntary surrender of a license under the FPA, the Commission determined that "no environmental impacts are expected" apart from the end of federal jurisdiction over the potentially historic structures.[5] J.A. 445–46; *see also id.* at 486 (stating that "the baseline, pre-project condition considered in the environmental analysis includes existence of the dams" because "the dams were constructed before the project was licensed"). FERC emphasized that the reservoir was a source of water for Somersworth and Berwick as well as for local manufacturing needs and firefighting efforts and that Somersworth was concerned that infrastructure may be negatively affected by changes to water levels. The Commission decided that further quantification of these impacts was unnecessary and that dam removal was not warranted as part of the license surrender. FERC also relied on

---

[4] The Town of Rollinsford owns the Rollinsford Dam but Green Mountain operates it and handles the licensing process.

[5] FERC requested comments from the Advisory Council on Historic Preservation and the Council agreed with FERC that an adverse effect on the potentially historic structures of "demolition by neglect" was not reasonably foreseeable and opined that approving a license surrender application would not constitute an adverse effect per se on historic properties.

its policy not to require installing fish passage facilities as a condition of license surrender and concluded that new facilities "would be for any 'successor' agency to consider." J.A. 447.

On June 20, 2023, Whitewater timely sought rehearing, arguing that FERC's approval of Aclara's surrender was not in the public interest under the FPA and that the Commission acted arbitrarily and capriciously by failing to take the NEPA-required hard look at the dam removal alternative. The Commission ultimately addressed Whitewater's arguments in its Order Addressing Arguments Raised on Rehearing (Rehearing Order), issued on September 21, 2023. FERC highlighted that if Green Mountain decided to trap and truck fish, then the dams would not block fish passage, that it was unknown whether the area would be publicly accessible for recreation and that both access to recreation and fish passage facilities were for a New Hampshire regulatory authority to consider. It also emphasized that there had been no history of public safety incidents at the dams and recited that FERC properly considered the dams' potential historic significance. Overall, the Commission determined that the "Surrender Order . . . appropriately concluded that the proposed surrender is in the public interest" because it "balanced the benefits and negative impacts" and concluded "that the concrete benefits provided by the dam far outweigh[ed] the speculative benefits to recreation and fish passage" of dam removal. J.A. 487–88.

Whitewater petitioned this Court for review on October 23, 2023. Maine Rivers and Conservation Law Foundation—two organizations that advocate for river restoration through eliminating barriers to fish passage—intervened on Whitewater's behalf and Aclara intervened on behalf of FERC.

12

**II.**

The Commission had jurisdiction to issue orders relating to the licensing of the Somersworth Hydroelectric Project under the FPA. 16 U.S.C. § 791a *et seq.* We have jurisdiction to review FERC final orders. 16 U.S.C. § 825*l*(b).

We will set aside FERC action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Commission's orders must be upheld so long as it "examine[d] the relevant [considerations] and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)). If supported by substantial evidence, the Commission's factual findings are conclusive. 16 U.S.C. § 825*l*(b). Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and requires more than a scintilla but less than a preponderance of evidence." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54 (D.C. Cir. 2014) (per curiam) (cleaned up). "For the agency to reverse its position in the face of a precedent it has not persuasively distinguished is quintessentially arbitrary and capricious." *La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999). NEPA "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). This Court "applies a rule of reason to an agency's NEPA analysis and has repeatedly refused to flyspeck the agency's findings in search of any deficiency no matter how minor." *Myersville*, 783 F.3d at 1322–23 (quotation omitted).

**A.**

No party disputes standing. "Nevertheless, we have an independent obligation to review petitioner's standing before addressing the merits." *Norfolk S. Ry. Co. v. Surface Transp. Bd.*, 72 F.4th 297, 304 (D.C. Cir. 2023) (cleaned up). To establish Article III standing, a plaintiff must show (1) injury in fact that is concrete and particularized and actual or imminent rather than conjectural or hypothetical, (2) causation fairly traceable to the defendant's challenged action and (3) redressability by a favorable decision that is likely as opposed to merely speculative. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Whitewater has standing based on its members' submitted declarations that they would recreate on this section of the Salmon Falls River if the Project dams were removed; they further declared that if FERC had conducted a proper analysis under NEPA, its decision may have been different, enabling its members to recreate there. That suffices to demonstrate standing. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 305–07 (D.C. Cir. 2013) (holding that an association's members sufficiently alleged a procedural injury in fact because they suffered harm to recreational interests from the agency's failure to adequately consider environmental factors, causation because the procedural defect was connected to the substantive result and redressability because the agency could change its mind if required to reconsider environmental concerns).

Intervenors must also satisfy standing requirements. *Deutsche Bank Nat'l Tr. v. FDIC*, 717 F.3d 189, 193 (D.C. Cir. 2013). Aclara has standing because Whitewater challenges the Commission's approval of Aclara's license surrender. *See Ameren Servs. Co. v. FERC*, 893 F.3d 786, 792 (D.C. Cir.

2018) ("[A] regulated party generally has standing to challenge an agency action regulating its behavior" and "[intervenor], unlike petitioner[], is the direct 'object of the action' being challenged.").

Intervenors Maine Rivers and Conservation Law Foundation advocate for river restoration by removing barriers to fish passage and their members are Maine residents who live and recreate in the river's watershed. They assert that they have an interest in this case because they are involved in other proceedings before FERC that involve similar statutory environmental analyses. That is not enough to support standing. An association must show that at least one of its members has been injured. *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016). Intervenors for Petitioner have not done so. And the mere fact that the case *sub judice* involves issues that may bear on separate proceedings does not satisfy standing. *See City of Cleveland v. Nuclear Regul. Comm'n*, 17 F.3d 1515, 1515–16 (D.C. Cir. 1994) (per curiam) ("[C]oncern about the precedential effect of an adverse decision is not sufficient to confer standing . . . ."). We will, however, exercise our discretion to "accord [Intervenors for Petitioner] amicus status so that [their] views on the common issues can be considered." *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 539 (D.C. Cir. 1999) (citing Fed. R. App. P. 29(a)).[6]

---

[6] The Commission also has not challenged whether the statutory cause of action encompasses Whitewater's claim. *See Myersville*, 783 F.3d at 1316 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 (2014)). In any event, the test for whether a petitioner's "interests fall within the zone of interests protected by the law invoked" is "lenient" and "not especially demanding." *Id.* A would-be petitioner is outside the statute's zone of interests only if its "interests are so marginally

15

**B.**

Aclara argues that Whitewater's petition is untimely because it was filed 94 days after the Denial Notice, although it was filed only 32 days after the Rehearing Order.  Aclara is wrong.

Under the FPA, an aggrieved party "may apply for a rehearing within thirty days after the issuance of [the aggrieving] order."  16 U.S.C. § 825*l*(a).  "Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied." *Id.*  An aggrieved party seeking judicial review must petition for review "within sixty days after the order of the Commission upon the application for rehearing." *Id.* § 825*l*(b).  Until the record is filed in a court of appeals, however, FERC "may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order." *Id.* § 825*l*(a).

---

related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). Whitewater relies on FPA and NEPA provisions requiring the Commission to assess the public interest and consider any environmental effects in a license surrender proceeding and "it is precisely injuries in those domains that [Whitewater] assert[s]." *Id.* That is enough to establish a cause of action under *Lexmark's* lenient standard.

16

*Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021), decides this issue.[7]  In *EDF*, we held that the 60-day deadline to petition for review did not preclude consideration of a petition filed within 60 days of a final denial of relief even if there had been a deemed denial more than 60 days before the petition was filed.  *Id.* at 972 (citing *Texas-Ohio Gas. Co. v. Fed. Power Comm'n*, 207 F.2d 615, 616–17 (D.C. Cir. 1953)).  Although a rehearing request *may* be deemed denied 30 days after it is filed, that does not mean that it *must be* and a litigant may either appeal after 30 days have elapsed or wait for the Commission to act.  *Texas-Ohio Gas Co.*, 207 F.2d at 616–17; *see also N.Y. State Dep't of Env't Conservation v. FERC*, 991 F.3d 439, 446 (2d Cir. 2021) ("[T]he 30-day timeline . . . binds only the agency, affording the aggrieved party discretion to either proceed to federal court after the expiration of the 30-day window or wait until FERC's order denying rehearing.").  It would be an "unreasonable result" to deem "the time for appealing to the courts [to] have passed" if the Commission does act on the rehearing request more than 60 days after those 30 days elapse.  *Texas-Ohio Gas Co.*, 207 F.2d at 617.

Although *EDF* involved a tolling order rather than the Denial Notice at issue here, that is a distinction without a difference.  In *Allegheny Def. Project v. FERC*, 964 F.3d 1, 16 (D.C. Cir. 2020) (en banc), we held that FERC "cannot use tolling orders to change the statutorily prescribed jurisdictional consequences of its inaction."  In other words, the Commission may not avoid a deemed denial after 30 days of inaction by issuing an order that falls short of "substantive engagement

---

[7]  *EDF* interpreted the Natural Gas Act but the FPA is "interpreted similarly." *Allegheny Def. Project v. FERC*, 964 F.3d 1, 16 (D.C. Cir. 2020) (en banc) (quoting *City of Clarksville v. FERC*, 888 F.3d 477, 484 (D.C. Cir. 2018)).

with the application." *Id.* at 13. Nevertheless, *Allegheny* also emphasized that the "question is not one of labels, but of signification." *Id.* Whether a deemed denial is accompanied by a Denial Notice, a tolling order or nothing, after 30 days of inaction an applicant may seek judicial review or wait for FERC to act on the application. As we stated in *EDF*, our invalidation in *Allegheny* of FERC's practice of issuing tolling orders "did not disturb th[e] binding precedent [of *Texas-Ohio Gas Co.*], which is squarely controlling in this case." 2 F.4th at 972.

## C.

Aclara next contends that the case is moot because, upon confirmation that Aclara had completed decommissioning in compliance with the Surrender Order, jurisdiction over the Project moved from FERC to New Hampshire, leaving the Commission without authority to order dam removal. If we vacate the Surrender Order, however, the license surrender would no longer be effective and FERC would regain jurisdiction to consider dam removal. *See N.Y. Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177, 1182 n.5, 1188 (D.C. Cir. 2004) (vacating and remanding an agency decision although the decision had terminated agency jurisdiction). Accordingly, this case is not moot.

18

**III.**

**A.**

Whitewater principally argues that the Commission improperly excluded the dam removal alternative from detailed consideration under NEPA.[8] We disagree.

Whitewater emphasizes that the Surrender Order noted "significant and permanent" "beneficial effects" of dam removal relating to river connectivity, boating opportunities and sustainable fishing compared to mostly "temporary" "[n]egative effects" of air and water pollution, species displacement and construction noise and traffic. J.A. 440. However, FERC also credited the City of Somersworth's statement that its water treatment process and upstream infrastructure would be negatively affected by water level changes and that the reservoir was used for firefighting. The City may have merely stated that it was "concerned" about potential impacts to upstream infrastructure but it was more emphatic as to its water supply, asserting that its water

---

[8] Maine Rivers and Conservation Law Foundation argue that FERC erred in not conditioning Project surrender on the construction of fish passage facilities. This issue is not properly before the Court for two reasons. First, Whitewater did not raise the issue in its opening brief and no extraordinary circumstance otherwise permits an intervenor to raise an issue not brought before the court by the petitioner. *See Cal. Dep't of Water Res. v. FERC*, 306 F.3d 1121, 1126 (D.C. Cir. 2002). Second, the fish passage facility issue was not raised with specificity in the only request for agency rehearing—Whitewater's—thereby failing to meet the FPA's strict exhaustion requirement. *See Ameren Servs. Co.*, 893 F.3d at 793. In any event, the Commission reasonably rejected this alternative because it lacks jurisdiction to require maintenance and monitoring after surrender. *Jackson County v. FERC*, 589 F.3d 1284, 1291–92 (D.C. Cir. 2009).

treatment process would "most likely be negatively impacted" by changes to water levels. J.A. 336–40. Moreover, the Commission was authorized to "modify . . . in whole or in part" its Surrender Order until the record was filed as part of a petition for review. 16 U.S.C. § 825*l*(a). In its Rehearing Order, FERC "conclud[ed] that the concrete benefits provided by [Stone Dam] far outweigh[ed] the speculative benefits to recreation and fish passage" from dam removal. J.A. 487–88.

Contrary to Whitewater's assertions, "[b]ecause [Whitewater] points to nothing suggesting that the information provided by [the City] was unreliable," the Commission did not have to "verif[y]" it by collecting further data. *Honeywell Int'l, Inc. v. EPA*, 372 F.3d 441, 447 (D.C. Cir. 2004). Instead, "absent evidence to the contrary," FERC was "entitled to rely on . . . representations by parties who were uniquely in a position to know the [relevant information]." *Id.* (quoting *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1125 (D.C. Cir. 1984) (per curiam)). Granted, in *Lacson v. DHS*, 726 F.3d 170, 179 (D.C. Cir. 2013), we said that *Honeywell*-type hearsay statements are barely enough to constitute substantial evidence and that agencies would "be well-advised to provide more direct evidence of the facts at issue, or affidavits by officials who possess personal knowledge of the facts, or more expansive explanations of the manner in which the officials confirmed those facts." Although not submitted in affidavit form, the City's comments were made in a signed motion to intervene before the Commission, which "constitutes a certificate" that the "contents are true as stated, to the best knowledge and belief of the signer." 18 C.F.R. § 385.2005(a)(2)(ii). That is a fortiori reliable enough compared to the statements that passed muster—even if barely so—in *Honeywell* and *Lacson*.

NEPA also does not require quantifying every environmental impact. *See Myersville*, 783 F.3d at 1325. Rather, "NEPA 'involves an almost endless series of judgment calls' left primarily to the agency, . . . including the question of how much information to seek from [interested] parties." *Food & Water Watch v. FERC*, 104 F.4th 336, 344 (D.C. Cir. 2024) (quoting *Duncan's Point Lot Owners Ass'n v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008)). In *Food & Water Watch* we went on to explain that FERC "reasonably declined to seek more information" because "no evidence suggest[ed] that a request would have produced useful information." *Id.* That showing may be sufficient to justify not seeking more information, but it is not required in every circumstance. Instead, here the Commission highlighted that the dam provided a supply of water for local residents as well as firefighting and manufacturing needs and that the City was concerned about negative impacts on its water treatment process and upstream infrastructure. Under *Myersville* and *Food & Water Watch*, FERC appropriately considered these existing uses and made a reasonable judgment call not to request data to quantify the impacts. We "refuse[] to 'flyspeck' the agency's findings in search of 'any deficiency no matter how minor.'" *Myersville*, 783 F.3d at 1322–23 (quoting *Nevada*, 457 F.3d at 93).

Whitewater further argues that the reasons not to remove Stone Dam do not apply to Back Dam. That is beside the point. The Commission reasonably concluded that removing only Back Dam would provide limited benefits because the dams are near each other and in an industrial setting. It is true that the surrounding area is also partly forested, residential, mixed urban and commercial. As FERC noted, however, there are no formal recreation facilities, it is not clear whether the bypass reach would be publicly accessible after surrender and Stone Dam would continue to present a barrier to boating. Whitewater, in turn, points out that the public has a right to use

the navigable waters of the United States. *See Slaughterhouse Cases*, 83 U.S. 36, 79 (1872). But Aclara highlights that "there are no public access points on either side of the river" near the dams and "both sides are private property with steep, rocky ledges." Intervenor for Resp't's Br. 23. Whitewater's reply brief does not dispute Aclara's assertions, which corroborate FERC's findings on public accessibility.

Moreover, the Commission credited Aclara's assertion that even when all water is spilled into the bypass reach, summer water flows are too low for boating. Whitewater claims that FERC did so without evidence but Whitewater itself provided a photo of the river dried up during the summer and data on historical river flows that corroborated the low summer flows. Although water flows are higher at other times of the year, it was reasonable for the Commission to put limited weight on foregone boating opportunities in New England outside the summer months. Finally, FERC's conclusion that the recreational benefits of removing Back Dam were speculative is supported by Whitewater itself, which provided FERC with only unsupported statements that recreation "would" or "could" occur after Back Dam's removal.

Whitewater next contends that the dam removal alternative should have been considered in greater detail because it was feasible in light of FERC's purpose. Whitewater alleges that the Commission's actions are at odds with *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 197–98 (D.C. Cir. 1991), in which we held that the Federal Aviation Administration acted reasonably by not discussing in detail alternatives that did not meet the agency's purpose. That an agency *may* decline to discuss in detail alternatives that do not meet its purpose does not mean that an agency *must* discuss in detail any alternative that does meet its purpose. Here, FERC's stated "purpose and need" for its EA was to satisfy its

responsibilities under NEPA relating to Aclara's proposed surrender of its license. J.A. 381. Although Whitewater asserts the purpose of the Commission's action was "license surrender" Pet'rs Reply Br. 13, FERC's purpose is more accurately characterized as "act[ing] upon" the application for surrender in accordance with its NEPA responsibilities, *Theodore Roosevelt Conservation P'Ship v. Salazar*, 661 F.3d 66, 74 (D.C. Cir. 2011). That purpose neither presupposes granting license surrender nor prejudges whether to approve surrender with or without dam removal.

Instead, FERC's responsibility under NEPA is to "take[] a 'hard look' at the environmental impacts of a proposed action." *Myersville*, 783 F.3d at 1324. In performing an EA specifically, one of the Commission's key responsibilities is to determine whether an action would have a significant impact on the environment, thereby triggering the need for an EIS. *Id.* at 1322. FERC fulfilled that obligation here by finding no such impact, which no party contests. An EA then requires only "brief discussion" of reasonable alternatives, *id.* at 1323 (cleaned up), suggesting that even less (if any) discussion of unreasonable alternatives is required. NEPA also does "not require agencies to elevate environmental concerns over other appropriate considerations." *Balt. Gas*, 462 U.S. at 97 (citing *Strycker's Bay*, 444 U.S. at 227). In light of water supply and infrastructure concerns, among other reasons, the Commission reasonably found that there were "no feasible alternatives" to surrender without dam removal. J.A. 384–85.

In any event, and as explained above, the Surrender Order and Rehearing Order supplemented the EA and discussed the benefits and drawbacks of dam removal in detail, going well beyond what NEPA requires absent a significant impact on the environment. *See Friends of the River v. FERC*, 720 F.2d 93, 106–08 (D.C. Cir. 1983) (agency may supplement its NEPA

analysis before a petition for review is filed). The Commission even "devot[ed] especially thorough attention" to Whitewater's favored dam removal alternative, having laid out and considered the no-action alternative of denying license surrender and the surrender approval alternatives of leaving the dams in place, removing the dams or ordering the construction of fish passage facilities. *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 107 (D.C. Cir. 2014). Under the deferential "rule of reason" standard applicable here, FERC has done enough. *Myersville*, 783 F.3d at 1322.

**B.**

Finally, Whitewater argues that the Commission violated the FPA by determining that dam removal was not in the public interest and by veering from its precedent. But NEPA challenges "fare no better when framed as [FPA] challenges." *Biological Diversity*, 67 F.4th at 1188. As discussed above, FERC considered the benefits and drawbacks of dam removal and reasonably considered that the public interest would be better served by leaving the dams in place. Of particular relevance here, under the Commission's Decommissioning Policy it "is unlikely that a dam or reservoir serving key municipal water needs . . . is going to be shut down." Decommissioning Policy, 60 Fed. Reg. at 345. Moreover, ordering dam removal against a licensee's wishes is a "rare case," *id.* at 340, and the Commission is reluctant to require a licensee to remove a structure that it did not build itself, *Pub. Util. Dist. No. 1 of Okanogan Cnty.*, 169 F.E.R.C. ¶ 61215, P 18 (2019) ("Requiring the developer of a failed, unconstructed project [to] be subjected, in addition to the loss of capital and money invested in the project, to requirements designed to remedy actions taken by others could provide a substantial, unwarranted disincentive to hydropower development."). In one case, FERC did order removal of a dam that predated the

licensee's ownership despite the licensee's request for relicensing, but that was because several important fish species could not otherwise be restored to their historical habitat. *Edwards Mfg. Co.*, 81 F.E.R.C. ¶ 61255, at 62210 (1997). There are no such concerns here.

The Commission's actions are also not at odds with its past orders. Similar to FERC's analysis of Back Dam here, in *Rochester Gas & Electric Corp.*, 100 F.E.R.C. ¶ 61113, P 11 (2002), the Commission noted that dam removal "would recover very little natural river channel" because there was another dam 1.5 miles upstream, limiting the environmental benefits from removal. Granted, there are migratory fish species here that were not present in *Rochester* but the trap-and-truck approach being considered at the time of the Commission's orders—and ultimately adopted—means the downstream dams will still prevent fish from swimming upstream even if the Project dams were removed. In any event, project decommissioning "solutions necessarily will vary from one situation to another." Decommissioning Policy, 60 Fed. Reg. at 340. FERC's order approving Aclara's surrender application without dam removal is a reasonable solution for the Salmon Falls River situation.

For the foregoing reasons, Whitewater's petition for review is denied.

*So ordered.*